

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

Peoples Benefit Life Insurance Company a/k/a Providian Life & Health Insurance Company, AUSA Life Insurance Company, Inc., PFL Life Insurance Company, Monumental Life Insurance Company, Bankers United Life Assurance Company, AmerUs Life Insurance Company, BlackRock 2001 Term Trust, Inc., BlackRock Strategic Term Trust, Inc., BlackRock Investment Quality Term Trust, Inc., BlackRock Broad Investment Grade 2009 Term Trust, Inc., BlackRock Fixed Income Opportunity Fund, BlackRock Advantage Term Trust, Inc., Obsidian Onshore Fund, BlackRock Financial Management, Inc., Commercial Guaranty Assurance, Ltd., St. George Holdings, Ltd., St. George Investments I, Ltd., St. George Investments III, Ltd., GFC St. George, Ltd., CGA Investment Management, Inc., Pacific Life Insurance Company, ACE Capital Re Overseas Ltd. f/k/a KRE Reinsurance, Ltd., Kern County Employees' Retirement Association, State of Ohio, Bureau of Workers' Compensation, Security Life and Trust Insurance Corporation, Southwestern Life Insurance Company, AIG-Hyperion EURIBOR ABS Fund plc f/k/a AIG-Hyperion PIBOR ABS Fund plc, Arkansas Teacher Retirement System, The Hyperion Total Return Fund, Inc., Enhance Reinsurance Company, Keyport Life Insurance Company, Hyperion Capital Management, Inc., Life Insurance Company of Georgia, Lion II Custom Investments LLC, Security Life of Denver Insurance Company, Southland Life Insurance Company, First Columbine Life Insurance Company, Midwestern United Life Insurance Company, Golden American Life Insurance Company, USG Annuity & Life Company, Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Life Assurance Company of Boston, Golden Eagle Insurance Corporation, ING Investment Management, LLC, Curtis Bay Insurance Co., Ltd., St. George Corporation, A.F. Portfolio Limited, Bayer Corporation Master Trust, Unisys Master Trust, R.J. Reynolds Company Defined Benefit Master Trust, Nabisco Inc. Defined Benefit Trust, Western Asset Management Company, Chrysler Insurance Company, Hotchkis and Wiley Low Duration Fund, Hotchkis and Wiley Total Return Bond Fund, Hotchkis and Wiley Balanced Fund, Hotchkis and Wiley Short-Term Investment Fund, Foodmaker Master Retirement Trust, Triangle Distributing Company Profit Sharing Plan Trust, AMR Investment Services Balanced Portfolio, ML Life Insurance Company of New York, Merrill Lynch Life Insurance Company, AAA Investment Co., American Automobile Association, Inc., Abington Memorial, AGFA Corporation Pension Plan Master Trust, American Cast Iron Pipe Company Pension Trust, American Museum of Natural History, American National Can Retirement Trust, American Nuclear Insurers, American Red Cross Endowment Fund, Armco Master Pension Trust, Bayer Corporation Master Trust, Bell Atlantic Master Trust, Berea College, State Street Bank & Trust Company, as Trustee of the Black & Decker Defined Benefit Plan Master Trust, Brandeis University, Carnegie Corporation of New York, Carnegie Institute of Washington, Carnegie Mellon University, Children's Hospital Foundation, Chubb & Son Inc. Master Trust, Cleveland Museum of Art, Cluett American Retirement Plan, Columbia University (CIM XII, L.L.C.), Copic, Direct Response Corporation, The Duke Endowment, Elf Atochem North America, Inc. Retirement Benefits Trust, Enterprise Reinsurance Holdings, Educational Employees Supplementary Retirement System of Fairfax County, Fieldcrest Canon, First Energy System Master Retirement Trust, Ford Foundation, Ford Motor Company Master Trust, Forethought Life Insurance Company, France-Merrick Foundation, Gerling Global Reinsurance Company of America, Haas, Evelyn & Walter Fund, Howard Heinz Endowment, Vira I. Heinz Endowment, Hershey Principal Trust, Trustee for Milton Hershey School, Hershey Income

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**

OCT   2 2000

Phil Lombardi, Clerk
U.S. DISTRICT COURT

Case No.

JURY TRIAL DEMANDED





Trust, Trustee for Milton Hershey School, Conrad N. Hilton Foundation, Harvey                    )
Hubell, Incorporated, Master Pension Trust, Marsh & McLennan U.S.                                )
Retirement Plan, Joint Industry Board/ Electric Inc., W. Alton Jones Foundation,                 )
Inc., John D. and Catherine T. MacArthur Foundation, Josiah Macy, Jr.                            )
Foundation, Mannesmann Corporation Master Trust, Manufacturers Investment                        )
Trust, Mary Flagler Cary Charitable Trust, MAS Funds – Multi Asset Class                         )
Portfolio, MAS Funds – Balanced Portfolio, MAS Funds – Fixed Income                              )
Portfolio, MAS Funds – High Yield Portfolio, MAS Funds – Intermediate                            )
Duration Portfolio, MAS Funds – Limited Duration Portfolio, MAS Funds –                          )
Special Purpose Fixed Income Portfolio, MAS Funds – Multi-Market Fixed                           )
Income Portfolio, MAS Offshore Leveraged Fixed Income Fund, Minnesota                            )
State Board of Investment, The Northern Trust Company as Trustee for the                         )
Monsanto Company Master Trust, Mount Holyoke College, Morgan Stanley                             )
Dean Witter Global Opportunity Bond Fund, MSDW SICAV U.S. High Yield                             )
Bond Fund, Municipal Fire & Police Ret. of Iowa, National Electric Contractors                  )
Assn. Pension Trust, New Church Investment Fund, New York City Firefighters                      )
Variable Supplement Fund, Philharmonic Symphony Society of New York,                             )
Northwest Community Healthcare, Northwestern Memorial Corporation, Olin                          )
Corporation, Commonwealth of Pennsylvania State Employees' Retirement                            )
System, Pacific Gas & Electric Corporation, PCFG Long Term Investment Co,                        )
PECO Energy Company, The Peddie School, Premark International, Inc.,                              )
Principia Corporation Pension Trust, Public School Teachers' Pension &                           )
Retirement Fund of Chicago, Rensaeleer Polytechnic Institute, Republic Funds,                   )
Pension Plan for the Employees of Joseph E. Seagram and Sons, Inc., SKF USA                      )
Inc., Administrator of SKF USA Inc Master Trust, The Northern Trust Company                      )
as Trustee for the Solutia Master Pension Trust, Sun American Series Trust,                      )
Sunoco, Inc. Master Retirement Trust, Sunoco, Inc. Master Trust for Defined                      )
Contribution Plans, SYNTEX U.S. Employees Pension Trust, Syracuse                                )
University, TI Employees Pension Trust, Trustees of the University of                            )
Pennsylvania, Trustees of the University of Pennsylvania – High Yield, Van                       )
Kampen High Yield and Total Return Fund, Van Kampen Worldwide High                              )
Income Fund, W.K. Kellogg Foundation Trust, Washington & Lee University,                         )
Wellesley College, Western Metal Industry Pension, Western PA Teamsters and                      )
Teamsters and Employers Pension Fund, X.L. Capital, Yeshiva University, York                     )
International Corporation,                                                                        )
                                                                                                 )
                                                            Plaintiffs,                          )
                                                                                                 )
            vs.                                                                                  )
                                                                                                 )
Mayer, Brown & Platt, an Illinois partnership,                                                   )
                                                                                                 )
                                                            Defendant.                           )

## COMPLAINT

### NATURE OF THE ACTION

1.      This is an action for, among other claims, securities fraud and professional

negligence brought by investors who purchased securities for more than $700 million in original

face amount, and insurers or reinsurers who are subrogated to the rights of certain of the original

purchasers. The defendant is Mayer, Brown & Platt (**"Mayer Brown"**), a Chicago law firm that played an integral role in devising, conducting and promoting the scheme by which the securities were issued and sold.

2.    The scheme involved a series of transactions sponsored by Commercial Financial Services, Inc. (**"CFS"**), an Oklahoma corporation that once was the nation's largest collector of defaulted credit card debt but now is in bankruptcy. Mayer Brown was CFS's principal legal counsel at all times relevant to this action, and it structured the asset-backed securitization transactions that funded CFS's operations.

3.    The basic structure of the transactions by which the securities were issued over a two-year period was as follows:

(a) CFS purchased from banks and other credit card issuers millions of dollars of defaulted credit card receivables that had been charged off – i.e., on which the issuers had ceased their own collection efforts (**"Loans"**) – at a deep discount from their face amount.

(b) CFS packaged the Loans into portfolios that collateralized "asset-backed securities" that were sold to investors (**"Notes"** or **"Securities"**) through bankruptcy-remote vehicles (**"Trusts"**) created by CFS affiliates. The Trusts were denominated initially as "Securitized Multiple Asset Rated Trust" (**"SMART"**) with consecutive numbers by year (e.g., SMART 96-2, SMART 97-1), and later as "Global Rated Eligible Asset Trust (**"GREAT"**). The original face value of the Notes issued by the Trusts exceeded $1.6 billion.

(c) Investors purchased the Notes in reliance upon, among other things, private placement memoranda provided to investors beginning in or about April 1997 (**"PPMs"**), and due diligence materials and other transaction documents prepared before and after that date, by Mayer Brown attorneys, Arthur Andersen LLP (CFS's auditors), and Chase Securities, Inc. (CFS's investment bankers) (collectively the **"Professionals"**), and CFS executives.

(d) Simultaneous with the sale of the Notes, CFS agreed to "service" the Loans for the Trusts – i.e., collect money from the obligors on the Loans. For this, CFS received a percentage of its collections as a servicing fee.

(e) Investors were to receive payments of principal and interest on the Notes from the proceeds of collections obtained by CFS in accordance with a cash flow model that

purportedly was based on, among other things, CFS's historical collection experience and its purportedly proven ability to service the Loans.

(f) After deducting its servicing fee and paying investors the principal and interest on the Notes, CFS was entitled to keep any additional money it received on the Loans (the **"Residual"**).

4.    To create a market for the Securities, CFS obtained from the nation's most prominent rating agencies at least an "A" rating or its equivalent on the investment quality of the Notes.  To satisfy an express condition precedent to the sale of Notes to Plaintiffs and other investors for each of the securitizations, Mayer Brown provided directly to Plaintiffs and the rating agencies legal opinion letters on a number of issues relating to the securitizations.  In issuing their ratings, the rating agencies relied on representations in Mayer Brown's opinion letters, the PPMs and other transaction documents prepared by Mayer Brown attorneys, CFS executives and its other Professionals.

5.    Mayer Brown intended that Plaintiffs and the rating agencies rely on these opinion letters and knew that without such opinion letters, the securitizations could not have gone forward.  In one example of these opinion letters -- referred to herein as a "Rule 10b-5 letter" -- issued in connection with the securitization that closed on August 6, 1997 and in succeeding securitizations, Mayer Brown made the following representation regarding the disclosures in the PPMs:

> [W]e advise you that no facts have come to our attention which lead us to believe that as of its date, the Memorandum [PPM] ... contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

At the time that it made this representation and substantially identical representations in connection with succeeding securitizations, to Plaintiffs and other investors, Mayer Brown knew facts, or recklessly disregarded facts that would have given rise to knowledge, that made this

representation false and misleading including, without limitation and as more fully set forth in

this Complaint, the following:

(a) CFS failed to collect from credit card obligors at the levels represented and necessary to meet the cash flow requirements for the securitizations.

(b) To disguise its collection shortfalls, CFS regularly and systematically sold to third parties the Loans it was hired to collect (**"Loan Sales"**), without disclosing to Plaintiffs and other investors that it was making these Loan Sales or that it depended on the Loan Sales to meet its cash flow requirements.

(c) In written offering materials, the proceeds of Loan Sales were misrepresented as "collections" to disguise CFS's failure to meet the cash flow requirements for the securitizations through its own servicing of the Loans.

(d) The written offering materials did not disclose that Mitchell Vernick, the first high level outsider to join CFS's senior management team, resigned within months of being hired because, among other things, he discovered that the CFS securitization model was not viable and believed that no improvement in management or productivity would make it viable.

(e) In September 1997, CFS began making Loan Sales to Dimat Corporation (**"Dimat"**), an affiliate of CFS, and began servicing the Loans it sold to Dimat, while the offering materials for Securities issued in and after September 1997 stated that CFS did not service Loans for third parties and did not sell Loans to affiliates.

(f) The offering materials for securitizations that closed in and after September 1997 failed to disclose CFS's continued dependence on Loan Sales to meet its cash flow requirements and its Loan Sales to a related entity.

(g) The fact that CFS depended upon Loan Sales to meet the cash flow requirements for the securitizations disguised the failure of CFS's business model and misled Plaintiffs and other investors.

(h) CFS had made Loan Sales a material part of its business model for meeting the cash flow requirements of the securitizations, but this fact was not disclosed to Plaintiffs or the rating agencies.

6.    An anonymous writer blew the whistle on the scheme in a letter dated

September 30, 1998, addressed to the rating agencies. This letter revealed information regarding

CFS's inability to collect on the Loans at the required levels, the steps taken to conceal from

investors CFS's actual collection performance (including its dependence on Loan Sales to close

the gap between collections and cash flow requirements), and the systemic failures of CFS's collections operation. In late October 1998, CFS publicly confirmed that there was "some basis" for certain of the statements in the anonymous letter.

7.    Once the truth about CFS's inability to meet the cash flow requirements on its securitizations and its dependence on Loan Sales became known, CFS could not continue its securitizations, thereby ending the flow of new capital to CFS. After reporting nearly $400 million in net revenues, $182 million in net income and $259 million in shareholders' equity as of December 31, 1997, and less than three months after its last securitization, CFS sought protection under the Bankruptcy Code in December 1998 and is now liquidating its remaining assets. Neither CFS nor the Trusts can repay Plaintiffs the principal amount of their investments or the interest owed.

8.    For the reasons set forth below, Mayer Brown is liable to Plaintiffs for the hundreds of millions of dollars in damages Plaintiffs have suffered as a result of Mayer Brown's misrepresentations and omissions, its breach of the duty of care it owed to Plaintiffs in connection with its issuance of legal opinion letters directly to Plaintiffs and the rating agencies, and its otherwise unlawful conduct under the Securities Exchange Act of 1934, the Oklahoma Securities Act, the blue sky securities laws of other states, and state common law.

## PARTIES

The AEGON Plaintiffs

9.    Plaintiff Peoples Benefit Life Insurance Company, known as Providian Life and Health Insurance Company until October 1, 1998, was, at all times material hereto, a Missouri corporation with its principal place of business in Pennsylvania. It has since been redomiciled to Iowa with its principal place of business in Iowa.

10.     Plaintiff PFL Life Insurance Company is an Iowa corporation with its principal place of business in Iowa.

11.     Plaintiff AUSA Life Insurance Company, Inc. is a New York corporation with its principal place of business in New York.

12.     Plaintiff Monumental Life Insurance Company is a Maryland corporation with its principal place of business in Maryland.  Peoples Security Life Insurance Company and Commonwealth Life Insurance Company were merged into Monumental Life Insurance Company on November 30, 1998.

13.     Plaintiff Bankers United Life Assurance Company is an Iowa corporation with its principal place of business in Iowa.

14.     Providian Capital Management, Inc. (**"Providian"**), now known as AEGON Institutional Markets, Inc., served as investment advisor to and agent of Providian Life and Health Insurance Company and Commonwealth Life Insurance Company in connection with the SMART 97-2 and 97-4 transactions.  In or about June 1997, Providian Life and Health Insurance Company, Commonwealth Life Insurance Company and Peoples Security Life Insurance Company were acquired by affiliates of AEGON USA Investment Management, Inc. (**"AEGON"**).  After September 1, 1997, AEGON served as investment advisor to and agent of Providian Life and Health Insurance Company, Commonwealth Life Insurance Company and Peoples Security Life Insurance.  In connection with the Notes purchases complained of herein, AEGON also was the agent of and investment advisor to Peoples Security Life Insurance Company, Commonwealth Life Insurance Company, and Plaintiffs PFL Life Insurance Company, Life Investors Insurance Company of America, AUSA Life Insurance Company, Inc., Monumental Life Insurance Company, Bankers United Life Assurance Company and Peoples

Benefit Life Insurance Company. All of these Plaintiffs are collectively referred to herein as the **"AEGON Plaintiffs."**

The AmerUs Plaintiff

      15.    Plaintiff AmerUs Life Insurance Company is an Iowa corporation with its principal place of business in Iowa.

The BlackRock Plaintiffs

      16.    Plaintiff BlackRock 2001 Term Trust, Inc. is a Maryland corporation with its principal place of business in New York.

      17.    Plaintiff BlackRock Strategic Term Trust, Inc. is a Maryland corporation with its principal place of business in New York.

      18.    Plaintiff BlackRock Investment Quality Term Trust, Inc. is a Maryland corporation with its principal place of business in the State of New York.

      19.    Plaintiff BlackRock Broad Investment Grade 2009 Term Trust, Inc. is a Maryland corporation with its principal place of business in New York.

      20.    Plaintiff BlackRock Fixed Income Opportunity Fund is a corporation organized under the laws of the Cayman Islands with its principal place of business in New York.

      21.    Plaintiff BlackRock Advantage Term Trust, Inc. is a Maryland corporation with its principal place of business in New York.

      22.    Plaintiff Obsidian Onshore Fund is a Delaware limited liability company with its principal place of business in New York.

      23.    Plaintiff BlackRock Financial Management, Inc. **("BlackRock")** is a Delaware corporation with its principal place of business in New York. At all relevant times, BlackRock was the agent of and investment advisor to Plaintiffs BlackRock 2001 Term Trust, Inc.,

BlackRock Strategic Term Trust, Inc., BlackRock Investment Quality Term Trust, Inc., BlackRock Broad Investment Grade 2009 Term Trust, Inc., BlackRock Fixed Income Opportunity Fund, BlackRock Advantage Term Trust, Inc. and Obsidian Onshore Fund. All such Plaintiffs are collectively referred to herein as the **"BlackRock Plaintiffs."**

The CGA Plaintiffs

24.     Plaintiff Commercial Guaranty Assurance, Ltd. **("CGA")** is an insurance company organized under the laws of Bermuda, with its principal place of business in Hamilton, Bermuda. CGA is a wholly owned subsidiary of CGA Group, Ltd. **("CGA Group")**. CGA Group is a holding company organized under the laws of Bermuda and domiciled in Hamilton, Bermuda.

25.     Plaintiffs St. George Holdings, Ltd. **("SGH")**, St. George Investments I, Ltd. **("SG-1")**, St. George Investments III, Ltd. **("SG-3")**, and GFC St. George, Ltd. **("GFCSG")** are limited liability companies organized under the laws of the Cayman Islands, with their principal place of business in Hamilton, Bermuda. SG-1, SG-3, and GFCSG are wholly owned subsidiaries of SGH. SG-1, SG-3, SGH, and GFCSG are investment vehicles organized for the purpose of making investments in asset-backed and other fixed-income Notes.

26.     Plaintiff Pacific Life Insurance Company ("Pacific Life") is a California stock life insurance company with its principal place of business in California.

27.     Plaintiff CGA Investment Management, Inc. **("CGAIM")** is a Delaware corporation with its principal place of business in New York. CGAIM is wholly owned by CGA Group. CGAIM is registered as an investment advisor with the United States Securities and Exchange Commission. CGAIM served as the investment advisor to and agent for SG-1, SG-3, SGH, and GFCSG.

28.     CGA, CGAIM, SG-1, SG-3, SGH, GFCSG, Pacific Life, and ACRO are, as applicable, hereinafter collectively referred to as the **"CGA Plaintiffs."**

Keyport Life Insurance Company

29.     Plaintiff Keyport Life Insurance Company (**"Keyport"**) is a Rhode Island insurance corporation with its principal place of business in Massachusetts.

The Hyperion Plaintiffs

30.     Plaintiff Kern County Employees' Retirement Association (**"KCERA"**) is a retirement system organized pursuant to the California County Employees' Retirement Act of 1937 with its principal place of business in California.

31.     Plaintiff State of Ohio, Bureau of Workers' Compensation (**"OBWC"**) is a state insurance fund organized under the laws of Ohio with its principal place of business in Ohio.

32.     Plaintiff Security Life and Trust Insurance Corporation, formerly known as Integon Life Insurance Corp. (**"Security Life"**) is a Texas insurance corporation with its principal place of business in Texas.

33.     Plaintiff Southwestern Life Insurance Company (**"Southwestern Life"**) is a Texas insurance corporation with its principal place of business in Texas.

34.     Plaintiff AIG-Hyperion EURIBOR ABS Fund plc, formerly known as AIG-Hyperion PIBOR ABS Fund plc (**"EURIBOR"**) is a variable capital company organized under the laws of Ireland with its principal place of business in Ireland.

35.     Plaintiff Arkansas Teacher Retirement System (**"ATRS"**) is a retirement system organized under the laws of the State of Arkansas with its principal place of business in Arkansas.

36.     Plaintiff The Hyperion Total Return Fund, Inc. **("HTR")** is a Maryland corporation with its principal place of business in New York.

37.     Plaintiff Enhance Reinsurance Company **("Enhance")** is a New York stock insurance company with its principal place of business in New York.

38.     Plaintiff Hyperion Capital Management, Inc. **("HCM")** is a Delaware corporation with its principal place of business in New York.  HCM served as investment advisor to and agent of each of KCERA, OBWC, Security Life, Southwestern Life, EURIBOR, ATRS, HTR and Enhance (collectively referred to herein as the **"Hyperion Plaintiffs"**) and Keyport.

The ING Plaintiffs

39.     Plaintiff Life Insurance Company of Georgia is a Georgia corporation with its principal place of business in Georgia.

40.     Plaintiff Lion II Custom Investments LLC is successor in interest to Indiana Insurance Company and Peerless Insurance Company and is a Delaware limited liability company with its principal place of business in Georgia.

41.     Plaintiff Security Life of Denver Insurance Company is a Colorado corporation with its principal place of business in Colorado.

42.     Plaintiff Southland Life Insurance Company is a Texas corporation with its principal place of business in Georgia.

43.     Plaintiff First Columbine Life Insurance Company is successor in interest to Columbine Life Insurance Company and a Colorado corporation with its principal place of business in Colorado.

44.     Plaintiff Midwestern United Life Insurance Company is an Indiana corporation with its principal place of business in Colorado.

45.    Plaintiff Golden American Life Insurance Company is a Delaware corporation with its principal place of business in Pennsylvania.

46.    Plaintiff USG Annuity & Life Company is an Oklahoma corporation with its principal place of business in Iowa.

47.    Plaintiff ING Investment Management, LLC (**"ING"**) is a Georgia corporation with its principal place of business in Georgia.  ING is the agent of and investor advisor to Plaintiffs Life Insurance Company of Georgia, Lion II Custom Investments LLC, Security Life of Denver Insurance Company, Southland Life Insurance Company, First Columbine Life Insurance Company, Midwestern United Life Insurance Company, Golden American Life Insurance Company and USG Annuity & Life Company (collectively referred to herein as the **"ING Plaintiffs"**).

The Western Asset Management Plaintiffs

48.    Plaintiff Curtis Bay Insurance Co., Ltd. is a corporation organized under the laws of Bermuda, with its principal place of business in Bermuda.

49.    Plaintiff St. George Corporation is an Illinois corporation with its principal place of business in Illinois.

50.    Plaintiff A.F. Portfolio Limited is a corporation organized under the laws of Bermuda with its principal place of business in Bermuda.

51.    Plaintiff Bayer Corporation Master Trust is a Pennsylvania trust with its principal place of business in Pennsylvania.

52.    Plaintiff Unisys Master Trust is a New York trust with its principal place of business in Pennsylvania.

53.    Plaintiff R.J. Reynolds Company Defined Benefit Master Trust is a New York trust with its principal place of business in North Carolina.

54.    Plaintiff Nabisco Inc. Defined Benefit Trust is a New York trust with its principal place of business in New Jersey.

55.    Plaintiff Western Asset Management Company is a California corporation with its principal place of business in California (**"Western Asset"**).  Western Asset is the agent and advisor to Curtis Bay Insurance Co., Ltd., St. George Corporation, A.F. Portfolio Limited, Bayer Corporation Master Trust, Unisys Master Trust, R.J. Reynolds Company Defined Benefit Master Trust, and Nabisco Inc. Defined Benefit Trust (collectively referred to herein as the **"Western Asset Plaintiffs"**).  Western Asset also served as agent and advisor to Western Asset Limited Duration Portfolio in connection with its purchase of asset-backed Notes issued in the GREAT 98-A transaction.

The Stein Roe Plaintiffs

56.    Plaintiff Chrysler Insurance Company is a Michigan corporation with its principal place of business in Michigan.

57.    Stein Roe & Farnham Incorporated is the agent and investment advisor to Chrysler Insurance Company and Keyport.

The H&W Plaintiffs

58.    Plaintiff Hotchkis and Wiley Low Duration Fund is a Massachusetts business trust with its principal place of business in California.

59.    Plaintiff Hotchkis and Wiley Total Return Bond Fund is a Massachusetts business trust with its principal place of business in California.

60.    Plaintiff Hotchkis and Wiley Balanced Fund is a Massachusetts business trust with its principal place of business in California.

61.    Plaintiff Hotchkis and Wiley Short-Term Investment Fund is a Massachusetts business trust with its principal place of business in California.

62.    Plaintiff Foodmaker Master Retirement Trust is an Illinois trust with its principal place of business in Illinois.

63.    Plaintiff Triangle Distributing Company Profit Sharing Plan Trust is an employee benefit plan trust organized under the laws of the State of California, with its principal place of business in California.

64.    Plaintiff AMR Investment Services Balanced Portfolio is a series of the AMR Investment Services Trust, a New York common law trust with its principal place of business in Texas.

65.    At the time of the events alleged herein, Hotchkis and Wiley (**"H&W"**) was a division of is a division of Merrill Lynch Asset Management, L.P.,  and an investment advisor registered under the Investment Advisers Act of 1940, and acted at all relevant times as agent for Hotchkis and Wiley Low Duration Fund, Hotchkis and Wiley Total Return Bond Fund, Hotchkis and Wiley Balanced Fund, Hotchkis and Wiley Short-Term Investment Fund, Foodmaker Master Retirement Trust, Triangle Distributing Company Profit Sharing Plan Trust, and AMR Investment Services Balanced Portfolio (collectively referred to herein as the **"H&W Plaintiffs"**).  Merrill Lynch Investment Managers, L.P. subsequently succeeded to all rights and obligations of H&W.

<u>The ML Plaintiffs</u>

66.     Plaintiff ML Life Insurance Company of New York **("MLLICNY")** is a New York insurance company with its principal place of business in New Jersey.

67.     Plaintiff Merrill Lynch Life Insurance Company **("MLLIC")** is an Arkansas insurance company with its principal place of business in New Jersey.

68.     At the time of the events alleged herein, Merrill Lynch Asset Management, L.P. **("MLAM")** was an investment advisor registered under the Investment Advisers Act of 1940, and agent for MLLICNY and MLLIC (collectively referred to herein as the **"ML Plaintiffs"**). MLAM subsequently changed its name to Merrill Lynch Investment Managers, L.P.

<u>The Liberty Companies</u>

69.     Plaintiff Liberty Mutual Insurance Company **("Liberty Mutual")** is a Massachusetts corporation with its principal place of business in Massachusetts.

70.     Plaintiff Liberty Mutual Fire Insurance Company **("Liberty Fire")** is a Massachusetts corporation with its principal place of business in Massachusetts.

71.     Plaintiff Liberty Life Assurance Company of Boston **("Liberty Life")** is a Massachusetts corporation with its principal place of business in Massachusetts.

72.     Plaintiff Golden Eagle Insurance Corporation **("Golden")** is a California corporation with its principal place of business in California.

73.     Liberty Mutual, Liberty Fire, Liberty Life and Golden are collectively referred to herein as the **"Liberty Companies."**

<u>The Miller Anderson and Morgan Stanley Plaintiffs</u>

74.     Plaintiff AAA Investment Co. is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of Delaware.

75.     Plaintiff American Automobile Association, Inc. is a corporation organized under the laws of the State of Connecticut with its principal place of business in the State of Florida.

76.     Plaintiff Abington Memorial is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

77.     Plaintiff AGFA Corporation Pension Plan Master Trust is an Employee Benefit Plan Trust organized under the laws of the State of Pennsylvania with its principal place of business in the State of New Jersey.

78.     Plaintiff American Cast Iron Pipe Company Pension Trust is a trust organized under the laws of the State of Alabama with its principal place of business in the State of Alabama.

79.     Plaintiff American Museum of Natural History is a corporation organized under the laws of the State of New York with its principal place of business in the State of New York.

80.     Plaintiff American National Can Retirement Trust is a Trust organized under the laws of the State of Delaware with its principal place of business in the State of Illinois.

81.     Plaintiff American Nuclear Insurers is an insurance company organized under the laws of the State of Connecticut with its principal place of business in the State of Connecticut.

82.     Plaintiff American Red Cross Endowment Fund is a trust organized under the laws of the United States with its principal place of business in the District of Columbia.

83.     Plaintiff Armco Master Pension Trust is a Trust organized under the laws of the State of New York with its principal place of business in the State of Ohio.

84.     Plaintiff Bayer Corporation Master Trust is a Trust organized under the laws of the State of Indiana with its principal place of business in the State of Pennsylvania.

85.    Plaintiff Bell Atlantic Master Trust is a Trust organized under the laws of the State of New York with its principal place of business in the State of Pennsylvania.

86.    Plaintiff Berea College is a corporation organized under the laws of the State of Kentucky with its principal place of business in the State of Kentucky.

87.    Plaintiff State Street Bank & Trust Company, as Trustee of the Black & Decker Defined Benefit Plan Master Trust is a Trust organized under the laws of the State of Massachusetts with its principal place of business in the State of Massachusetts.

88.    Plaintiff Brandeis University is a corporation organized under the laws of the State of Massachusetts with its principal place of business in the State of Massachusetts.

89.    Plaintiff Carnegie Corporation of New York is a non-profit foundation organized under the laws of the State of New York with its principal place of business in the State of New York.

90.    Plaintiff Carnegie Institute of Washington is a corporation organized under the laws of the District of Columbia with its principal place of business in the District of Columbia.

91.    Plaintiff Carnegie Mellon University is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

92.    Plaintiff Children's Hospital Foundation is a non-profit corporation organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

93.    Plaintiff Chubb & Son Inc. Master Trust is a trust organized under the laws of the State of New York with its principal place of business in the State of New York.

94.    Plaintiff Cleveland Museum of Art is a trust organized under the laws of the State of Ohio with its principal place of business in the State of Ohio.

95.    Plaintiff Cluett American Retirement Plan is a Trust organized under the laws of the State of Delaware with its principal place of business in the State of New York.

96.    Plaintiff Columbia University (CIM XII, L.L.C.) is a Limited Liability Corporation organized under the laws of the State of New York with its principal place of business in the State of New York.

97.    Plaintiff Copic is an insurance company organized under the laws of the State of Colorado with its principal place of business in the State of Colorado.

98.    Plaintiff Direct Response Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of New York.

99.    Plaintiff The Duke Endowment is a Trust organized under the laws of the State of New Jersey with its principal place of business in the State of North Carolina.

100.    Plaintiff Elf Atochem North America, Inc. Retirement Benefits Trust is a Trust organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

101.    Plaintiff Enterprise Reinsurance Holdings is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of New York.

102.    Plaintiff Educational Employees Supplementary Retirement System of Fairfax County is a Private Pension Fund organized under the laws of the State of Virginia with its principal place of business in the State of Virginia.

103.    Plaintiff Fieldcrest Canon is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of North Carolina.

104.    Plaintiff First Energy System Master Retirement Trust is a Trust organized under the laws of the State of New York with its principal place of business in the State of New York.

105.    Plaintiff Ford Foundation is a foundation organized under the laws of the State of New York with its principal place of business in the State of New York.

106.    Plaintiff Ford Motor Company Master Trust is a Trust organized under the laws of the State of Michigan with its principal place of business in the State of Michigan.

107.    Plaintiff Forethought Life Insurance Company is an insurance company corporation organized under the laws of the State of Indiana with its principal place of business in the State of Indiana.

108.    Plaintiff France-Merrick Foundation is a tax-exempt private foundation organized under the laws of the State of Maryland with its principal place of business in the State of Maryland.

109.    Plaintiff Gerling Global Reinsurance Company of America is an insurance company organized under the laws of the State of New York  with its principal place of business in the State of New York.

110.    Plaintiff Haas, Evelyn & Walter, Fund is a corporation organized under the laws of the State of California with its principal place of business in the State of California.

111.    Plaintiff Howard Heinz Endowment is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

112.    Plaintiff Vira I. Heinz Endowment is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

113.    Plaintiff Hershey Principal Trust, Trustee for Milton Hershey School is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

114.    Plaintiff Hershey Income Trust, Trustee for Milton Hershey School is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

115.    Plaintiff Conrad N. Hilton Foundation is a non-profit corporation organized under the laws of the State of Nevada with its principal place of business in the State of Nevada.

116.    Plaintiff Harvey Hubell, Incorporated, Master Pension Trust is a Trust organized under the laws of the State of Connecticut with its principal place of business in the State of Connecticut.

117.    Plaintiff Marsh & McLennan U.S. Retirement Plan is a trust organized under the laws of the State of Delaware with its principal place of business in the State of New York.

118.    Plaintiff Joint Industry Board/ Electric Inc. is a corporation organized under the laws of the State of New York with its principal place of business in the State of New York.

119.    Plaintiff W. Alton Jones Foundation, Inc. is a private foundation organized under the laws of the State of New York with its principal place of business in the State of Virginia.

120.    Plaintiff John D. and Catherine T. MacArthur Foundation is a corporation organized under the laws of the State of Illinois with its principal place of business in the State of Illinois.

121.    Plaintiff Josiah Macy, Jr. Foundation is a foundation organized under the laws of the State of New York with its principal place of business in the State of New York.

122.    Plaintiff Mannesmann Corporation Master Trust is a trust organized under the laws of the State of New York with its principal place of business in the State of New York.

123.    Plaintiff Manufacturers Investment Trust is a trust organized under the laws of the State of Massachusetts with its principal place of business in the State of Massachusetts.

124.    Plaintiff Mary Flagler Cary Charitable Trust is a Trust organized under the laws of the State of New York with its principal place of business in the State of New York.

125.    Plaintiff MAS Funds – Multi Asset Class Portfolio is a Trust organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

126.    Plaintiff MAS Funds – Balanced Portfolio is a Trust organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

127.    Plaintiff MAS Funds – Fixed Income Portfolio is a Trust organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

128.    Plaintiff MAS Funds – High Yield Portfolio is a Trust organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

129.    Plaintiff MAS Funds – Intermediate Duration Portfolio is a Trust organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

130.    Plaintiff MAS Funds – Limited Duration Portfolio is a Trust organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

131.    Plaintiff MAS Funds – Special Purpose Fixed Income Portfolio is a Trust organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

132.    Plaintiff MAS Funds - Multi-Market Fixed Income Portfolio is a Trust organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

133.    Plaintiff MAS Offshore Leveraged Fixed Income Fund is a corporation organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

134.    Plaintiff Minnesota State Board of Investment is a public fund organized under the laws of the State of Minnesota with its principal place of business in the State of Minnesota.

135.    Plaintiff The Northern Trust Company as Trustee for the Monsanto Company Master Trust is a Trust organized under the laws of the State of Illinois with its principal place of business in the State of Illinois.

136.    Plaintiff Mount Holyoke College is a corporation organized under the laws of the State of Massachusetts with its principal place of business in the State of Massachusetts.

137.    Plaintiff Morgan Stanley Dean Witter Global Opportunity Bond Fund is a corporation organized under the laws of the State of Maryland with its principal place of business in the State of New York.

138.    Plaintiff MSDW SICAV U.S. High Yield Bond Fund is a corporation organized under the laws of Luxembourg with its principal place of business in Luxembourg.

139.    Plaintiff Municipal Fire & Police Ret. of Iowa is a public retirement system organized under the laws of the State of Iowa with its principal place of business in the State of Iowa.

140.    Plaintiff National Electric Contractors Assn. Pension Trust is a Trust organized under the laws of the District of Columbia with its principal place of business in the District of Columbia.

141.    Plaintiff New Church Investment Fund is an investment partnership organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

142.    Plaintiff New York City Firefighters Variable Supplement Fund is a Trust organized under the laws of the State of New York with its principal place of business in the State of New York.

143.    Plaintiff Philharmonic Symphony Society of New York is a corporation organized under the laws of the State of New York with its principal place of business in the State of New York.

144.    Plaintiff Northwest Community Healthcare is a corporation organized under the laws of the State of Illinois with its principal place of business in the State of Illinois.

145.    Plaintiff Northwestern Memorial Corporation is a corporation organized under the laws of the State of Illinois with its principal place of business in the State of Illinois.

146.    Plaintiff Olin Corporation is a corporation organized under the laws of the State of Virginia with its principal place of business in the State of Connecticut.

147.    Plaintiff Commonwealth of Pennsylvania State Employees' Retirement System is a governmental plan organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

148.    Plaintiff Pacific Gas & Electric Corporation is a corporation organized under the laws of the State of California with its principal place of business in the State of California.

149.    Plaintiff PCFG Long Term Investment Co., is a corporation organized under the laws of Bermuda with its principal place of business in Bermuda.

150.    Plaintiff PECO Energy Company is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

151.    Plaintiff The Peddie School is a corporation organized under the laws of the State of New Jersey with its principal place of business in the State of New Jersey.

152.    Plaintiff Premark International, Inc. is a corporation organized under the laws of the State of Illinois with its principal place of business in the State of Illinois.

153.    Plaintiff Principia Corporation Pension Trust is a is a Trust organized under the laws of the State of Missouri with its principal place of business in the State of Missouri.

154.    Plaintiff Public School Teachers' Pension & Retirement Fund of Chicago is a Trust organized under the laws of the State of Illinois with its principal place of business in the State of Illinois.

155.    Plaintiff Rensaeleer Polytechnic Institute is a corporation organized under the laws of the State of New York with its principal place of business in the State of New York.

156.    Plaintiff Republic Funds is a master trust organized under the laws of the State of New York with its principal place of business in the State of New York.

157.    Plaintiff Pension Plan for the Employees of Joseph E. Seagram and Sons, Inc. and Subsidiaries is a trust organized under the laws of the State of  Illinois with its principal place of business in the State of New York.

158.    Plaintiff SKF USA Inc., Administrator of SKF USA Inc Master Trust is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of Pennsylvania.

159.    Plaintiff The Northern Trust Company as Trustee for the Solutia Master Pension Trust is a trust organized under the laws of the State of Illinois with its principal place of business in the State of Illinois.

160.    Plaintiff Sun American Series Trust is a trust organized under the laws of the State of Massachusetts with its principal place of business in the State of California.

161.    Plaintiff Sunoco, Inc Master Retirement Trust is a trust organized under the laws of the State of New York with its principal place of business in the State of New York.

162.    Plaintiff Sunoco, Inc. Master Trust for Defined Contribution Plans is a trust organized under the laws of the State of New York with its principal place of business in the State of New York.

163.    Plaintiff SYNTEX U.S. Employees Pension Trust is a trust organized under the laws of the State of California with its principal place of business in the State of California.

164.    Plaintiff Syracuse University is a non-profit education corporation organized under the laws of the State of New York with its principal place of business in the State of New York.

165.    Plaintiff TI Employees Pension Trust is a trust organized under the laws of the State of Delaware with its principal place of business in the State of Texas.

166.    Plaintiff Trustees of the University of Pennsylvania is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

167.    Plaintiff Trustees of the University of Pennsylvania - High Yield is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

168.    Plaintiff Van Kampen High Yield and Total Return Fund is a trust organized under the laws of the State of Maryland with its principal place of business in the State of Illinois.

169.    Plaintiff Van Kampen Worldwide High Income Fund is a trust organized under the laws of the State of Maryland with its principal place of business in the State of Illinois.

25

170.   Plaintiff W.K. Kellogg Foundation Trust is a private foundation organized under the laws of the State of Michigan with its principal place of business in the State of Michigan.

171.   Plaintiff Washington & Lee University is a corporation organized under the laws of the State of Virginia with its principal place of business in the State of Virginia.

172.   Plaintiff Wellesley College is a corporation organized under the laws of the State of Massachusetts with its principal place of business in the State of Massachusetts.

173.   Plaintiff Western Metal Industry Pension is a trust organized under the laws of the State of Washington with its principal place of business in the State of Washington.

174.   Plaintiff Western PA Teamsters and Teamsters and Employers Pension Fund is a Trust organized under the laws of the State of Pennsylvania with its principal place of business in the State of Pennsylvania.

175.   Plaintiff X.L. Capital is a corporation organized under the laws of Bermuda with its principal place of business in Bermuda.

176.   Plaintiff Yeshiva University is a Corporation organized under the laws of the State of New York with its principal place of business in the State of New York.

177.   Plaintiff York International Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of Pennsylvania.

178.   At all times relevant hereto, Miller Anderson & Sherrerd LLP was investment advisor to and agent for those Plaintiffs identified in paragraphs 74-85, 87-96, 98-115, 117-136, 139-159, 161-168, and 170-177 above.  At all times relevant hereto, Morgan Stanley Dean Witter Investment Management, Inc., was investment advisor to and agent for those Plaintiffs identified in paragraphs 86, 97, 116, 137-138, 160, and 169 above.

179.    The Plaintiffs identified in paragraphs 74 through 178 are collectively referred to herein as the **"Miller Anderson and Morgan Stanley Plaintiffs."**

DEFENDANT MAYER BROWN

180.    Defendant Mayer, Brown & Platt is an Illinois partnership in the business of the practice of law, with its principal place of business in Chicago, Illinois. Mayer Brown was CFS's principal outside counsel at all times relevant to this action. In addition, Mayer Brown directly provided to Plaintiffs legal advice in the form of legal opinions in connection with their investment in the Securities.

## JURISDICTION

181.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332, Section 27 of the Securities Exchange Act of 1934, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over those claims as to which it does not have original jurisdiction.

## VENUE

182.    Venue is proper in this district because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district and Mayer Brown is subject to personal jurisdiction in this district (to the extent there is no district in which the action otherwise may be brought) pursuant to 28 U.S.C. § 1391.

## FACTUAL OVERVIEW

**Mayer Brown's Relationship With CFS**

183.    William Bartmann (**"Bartmann"**), his wife, Kathryn Bartmann, and Jay Jones (**"Jones"**) formed CFS in 1986. From its inception, Bartmann, Kathryn Bartmann and Jones, owned or controlled, directly or indirectly, at least 97% of the common stock of CFS.

184.    Beginning at least by 1995 and continuing until the end of 1998, Mayer Brown served as principal outside counsel and legal advisor to CFS.  Mayer Brown designed and structured CFS's securitization program and became familiar with all aspects of CFS's operations.  Mayer Brown, with CFS executives and other Professionals, prepared or reviewed before their dissemination the written materials used in the sale of the Securities, including the PPMs and most of the other transaction documents provided to investors and the rating agencies, and prepared much of the due diligence material provided to potential investors and the rating agencies.  On March 10, 1997, for example, CFS General Counsel Caroline Benediktson advised Bartmann and other CFS executives that Mayer Brown wanted to review all the due diligence material on SMART 97-3 (which closed on April 10, 1997) before it was disseminated to investors and the rating agencies to ensure that the material was consistent with the PPM for that transaction.

185.    From 1995 through 1998, Jason H. P. Kravitt (**"Kravitt"**) was the Mayer Brown partner in charge of the CFS account.  Nearly 200 Mayer Brown attorneys and approximately 50 support staff worked on and billed time to CFS-related matters.  (In this Complaint, Plaintiffs have not identified by name each of these Mayer Brown attorneys, other than Kravitt.  Except when the Complaint refers to "an unknown Mayer Brown attorney," Plaintiffs' counsel know the identity of the particular Mayer Brown lawyer whose statement or act is quoted or described in the Complaint and can provide that information to Mayer Brown or the Court upon request.)

186.    In addition to providing legal services to CFS in connection with the CFS-sponsored securitizations in which Plaintiffs invested, Mayer Brown served as CFS's litigation counsel and as personal counsel to the Bartmanns, for whom it created numerous trusts into which the Bartmanns transferred large amounts of their CFS stock.

187.    In January 1997 and again from September 1997 through August 1998, Mayer Brown provided legal advice to CFS and drafted documents for CFS in connection with a planned initial public offering of equity in CFS (the **"Planned IPO"**).  Although the Planned IPO never reached fruition, in the course of their work on the Planned IPO, Mayer Brown attorneys obtained information regarding CFS's operations as part of their effort to determine the disclosures to be made to potential public investors regarding CFS's operations.  As described below, many of the material facts that Mayer Brown considered disclosing to public investors in connection with the Planned IPO were not disclosed to Plaintiffs and other investors in the SMART and GREAT offerings.

188.    Mayer Brown provided a variety of other professional services to CFS and the Bartmanns.  During 1997, for example, it assisted Bartmann in considering the purchase of a National Basketball Association team.  Also, from 1996 through 1998, CFS hosted an annual Super Bowl party and "seminar" to which it invited all of its key employees, representatives of the nation's three most prominent rating agencies, its Professionals and investors.  At each such Super Bowl event, Kravitt, the Mayer Brown partner in charge of the CFS account, acted as the master of ceremonies.  Kravitt was also listed as a contact person for a specified list of attendees at one of the Super Bowl events.

189.    By its multi-faceted representation of, and close involvement with, CFS and the Bartmanns, Mayer Brown acquired intimate knowledge of CFS's business and assisted CFS in the development of that business.

**Factual Background Regarding CFS's Operations**

190.    In 1995, CFS began purchasing charged-off credit card receivables (i.e., Loans) from some of the nation's largest credit card issuers.  By 1997, CFS became the largest purchaser

and servicer of these Loans in the United States, with over 3,000 employees, reported annual net revenues of approximately $396 million, annual net income of approximately $182 million, and shareholder equity of approximately $259 million.

191.    Beginning in 1995, CFS entered into various agreements with credit card issuers, including Chase Manhattan Bank (**"Chase Bank"**), under which CFS became obligated to purchase Loans on a continuing basis. These "forward flow" agreements guaranteed CFS a steady supply of Loans but also generated a continuing obligation on CFS's part to pay for the Loans. Kravitt assisted CFS and Bartmann in developing a business relationship with Chase Bank and its affiliate, Chase Securities, Inc. (**"Chase Securities"**).

192.    Initially, to finance its purchases of Loans from credit card issuers, CFS borrowed money from various banks, including Chase Bank, pursuant to various lending programs including "Warehouse" lines of credit.

**The Asset-Backed Securities Sold to Plaintiffs**

193.    In 1995, CFS began to fund its business by sponsoring asset-backed securitizations through special purpose bankruptcy-remote entities or Trusts. The asset-backed securitization program was designed: (a) to provide CFS with low-cost funding for its Loan purchases; and (b) to provide CFS with an immediate profit and infusion of cash.

194.    Mayer Brown attorneys designed and structured each of these securitizations and held themselves out to the investment community as the premier legal experts in asset-backed securitizations. Kravitt authored a leading legal treatise on asset-backed securitizations entitled "Securitization of Financial Assets," and his status as CFS's lead counsel gave rating agencies and investors comfort in the integrity of CFS's operations.

195.    In 1995, CFS sponsored its first two securitizations, known as SMART 95-1 and SMART 95-2. The pools of assets securing the SMART 95-1 and SMART 95-2 Notes did not include Loans (i.e., delinquent credit card receivables), but rather involved other types of consumer debt primarily purchased from the Federal Deposit Insurance Corporation and Resolution Trust Corporation.

196.    In 1996, CFS began securitizing Loans. SMART 96-1, which closed on March 25, 1996, was the first CFS-sponsored securitization of Loans but it included other types of non-performing consumer debt as well. Plaintiffs did not invest in SMART 95-1, SMART 95-2 or SMART 96-1.

197.    From June 1996 through September 1998, CFS sponsored twelve additional securitizations, beginning with SMART 96-2, all exclusively secured by Loans, raising approximately $1.6 billion from investors, including Plaintiffs.

198.    The basic structure of the securitization transactions starting with SMART 96-2 was described to Plaintiffs and other investors as follows:

(a)    The Trusts sold to Plaintiffs and other investors debt securities, or Notes, that were secured by thousands of assets pooled together and sold to the Trusts at a profit to CFS. CFS used the proceeds of these sales to pay down its Warehouse lines of credit.

(b)    Simultaneously with CFS's sale of Loans to the Trusts, and the Trusts' sale of Notes to investors, the Trusts hired CFS to service the Loans pursuant to contracts known as **"Servicing Agreements"** that paid CFS a servicing fee ranging from 15% to 25% of the amounts it collected from servicing the Loans. Among other things, the Servicing Agreements required CFS to meet minimum collection performance standards in accordance with CFS's **"Credit and Collection Policy."**

(c)    As structured, the Trusts were to use the net collections generated by CFS as servicer to pay principal and interest to investors until the debt evidenced by the Notes was repaid. Thus, the investors' recovery of principal and interest on the Notes depended on CFS's ability to collect the debt owed by obligors on the Loans. CFS was entitled to keep any amounts it collected in excess of that necessary to retire the Notes (i.e., the Residual).

199.    CFS's ability to obtain from the nation's most prominent rating agencies at least an "A" rating or its equivalent on the investment quality of the Notes allowed CFS and its Professionals to create a market for the securities. The PPMs prepared by Mayer Brown for each of the CFS-sponsored securitizations beginning with SMART 97-3 provided that "a condition to the issuance of the Notes" was "that the Notes be rated at least 'A' or its equivalent by each Rating Agency." The PPMs for each subsequent SMART and GREAT securitization included substantially similar language. In addition to this statement in the PPMs, Mayer Brown knew that CFS could not sell the Notes to investors such as Plaintiffs without obtaining at least an "A" rating or its equivalent on the investment quality of the Notes. This is shown, for example, by the comments of Mayer Brown lawyers in documents they prepared for the Planned IPO:

(a) On a draft Prospectus for the Planned IPO dated September 28, 1997, a Mayer Brown lawyer wrote: "Servicer RATINGS -- downgrade would be a problem. . . . Ratings are required -- no assurance that will be avail. in future."

(b) On a draft Prospectus for the Planned IPO dated November 11, 1997, a Mayer Brown lawyer wrote: "our ability to securitize charged-off credit card receivables depends upon one or more rating agencies issuing investment-grade ratings for the securities issued in the securitizations."

(c) On a draft Prospectus for the Planned IPO dated November 12, 1997, a Mayer Brown lawyer wrote: "If the rating agencies downgrade the securities in our securitizations ... investors would require higher rates of return on their investments. This could make it prohibitively expensive or impossible for us to complete future securitizations."

200.    Mayer Brown played an important role in obtaining the ratings necessary for the securitizations by directly providing the rating agencies with information regarding CFS and the securitizations. On August 15, 1996, for example, Caroline Benediktson, CFS's general counsel, directed Standard and Poors and others to contact Kravitt to discuss why the structure of SMART 96-3 differed from that of prior securitizations. In turn, in issuing their ratings, the rating agencies relied on information provided by Mayer Brown. Standard and Poors' rating

letters, for example, state that it relied "on the issuer and its counsel, accountants and other experts for the accuracy and completeness of the information submitted in connection with the rating."

201.    Between June 1996 and September 1998, ten SMART and two GREAT securitizations closed on the following dates:

| **Transaction** | **Closing Date** |
|---|---|
| SMART 96-2 | June 19, 1996 |
| SMART 96-3 | August 27, 1996 |
| SMART 96-4 | December 23, 1996 |
| SMART 97-1 | February 7, 1997 |
| SMART 97-2 | March 6, 1997 |
| SMART 97-3 | April 10, 1997 |
| SMART 97-4 | August 6, 1997 |
| SMART 97-5 | September 29, 1997 |
| SMART 97-6 | December 10, 1997 |
| SMART 98-1 | February 27, 1998 |
| GREAT 98-A | June 30, 1998 |
| GREAT 98-B | September 30, 1998 |

202.    In connection with the securitizations, Mayer Brown provided legal opinion letters directly addressed to Plaintiffs and the rating agencies on a number of issues relating to the securitizations.  Mayer Brown represented to Plaintiffs in its Rule 10b-5 letters that "no facts have come to [Mayer Brown's] attention which lead [Mayer Brown] to believe" that the PPMs and other documents relating to the securitizations contained "an untrue statement of a material fact" or omitted "to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading."  As demonstrated below, these affirmative representations were materially false and Mayer Brown knew, or recklessly

disregarded facts that would have given rise to knowledge, of their falsity. In addition, the opinion letters omitted to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

203.    Mayer Brown also represented in its opinion letters that it had reasonably relied on the information in the PPMs and other transaction-related documents provided in connection with the securitizations and that it had reasonably assumed the truth of that information in issuing its opinions to the rating agencies, to Plaintiffs and other investors. As demonstrated below, Mayer Brown knew, or recklessly disregarded facts that would have given rise to knowledge, that its reliance on the referenced documents and its assumption of the accuracy of the information in those documents was unreasonable.

**Representations Concerning CFS's Purported Business Model**

204.    Because the Trusts had no significant assets or sources of funds other than the Loans, repayment of principal and interest on the Notes depended on CFS's ability to collect the debt owed by the credit card obligors in the pool of Loans securing the Notes.

205.    For the SMART and GREAT securitizations, Plaintiffs, other investors and potential investors, and the rating agencies, were provided PPMs, due diligence material and other transaction-related documents that, among other things, stated that:

(a)    CFS had developed a highly sophisticated, proprietary "**ECR**" model, defined at various times as "Estimated Collectability Rate" or "Estimated Cash Recovery," used on each securitization to determine CFS's best estimate of the "amount of cash it expects to recover from the Loans (not including future interest accruals on the Loans) based on [CFS's] own capabilities" or "amount of cash it expects to recover over time from the Loans (not including collections relating to future interest accruals on the Loans) based on [CFS's] own capabilities." [Except as otherwise noted herein, emphasis is added].

(b)    The ECR assigned to each Loan was determined by, among other factors, CFS's "historical collection experience with respect to nonperforming assets."

(c) CFS had developed "Base Case," "Stress Case" and "Default Case" cash flow models for each securitization which it ran at the outset of each securitization to establish the cash flow requirements against which its actual performance over the life of the securitization would be compared. CFS used the cash flow models to assure rating agencies and investors that CFS could collect on each Loan portfolio amounts in excess of that necessary to pay off the principal and interest on the Notes secured by those Loans.

(d) CFS made, and would continue to make, collections in accordance with its established and disclosed Credit and Collection Policy, which did not include any procedures or policies for making Loan Sales to meet the cash flow requirements for the securitizations.

(e) CFS devoted all of its efforts to servicing the Loans in the Trusts and did not service for any third party.

(f) CFS would not sell any of the Loans out of the Trusts to an affiliated entity.

(g) The portfolio of Loans would generate enough cash collections to provide CFS with a substantial Residual.

**Mayer Brown's Involvement In Marketing The Securities**

206.    Mayer Brown, with CFS executives and its other Professionals, provided substantial and direct assistance in marketing the Notes. On April 29, 1996, for example, a Mayer Brown lawyer, at Kravitt's direction, sent potential investors a letter enclosing Standard & Poors' "write-up discussing the SMART 96-2 transaction" and invited them to contact Mayer Brown to "discuss the write-up or other matters concerning CFS (Servicer)." On May 10, 1996, the month before SMART 96-2 closed, this Mayer Brown lawyer, again at Kravitt's direction, sent potential investors CFS's financial statements and other material regarding CFS and invited potential investors to contact Mayer Brown to discuss "any of the enclosed materials or other matters concerning CFS (Servicer)." Also, in January of each year from 1996 through 1998, Kravitt, the Mayer Brown partner in charge of the CFS account, acted as the master of ceremonies at the annual Super Bowl party and "seminar" hosted by CFS and attended by CFS's

key employees, representatives of the nation's three most prominent rating agencies, its outside Professionals, other investors and potential investors, including certain Plaintiffs or their agents.

207.    The marketing of the Notes offered in each securitization focused on:  (a) the strengths of CFS's management, systems, operations, personnel and procedures; (b) CFS's historical collection performance levels as compared to the benchmarks established by the Base Case and Stress Case cash flow models; and (c) the predictive validity of the collection model CFS developed to show what potential investors could expect CFS to collect based on CFS's past performance and purportedly proven, unique debt collection expertise.

208.    The written materials used to market the Notes to Plaintiffs included written material such as the PPMs, due diligence books and/or other written communications with rating agencies and investors.  These written materials, prepared by CFS executives and its Professionals, including Mayer Brown, falsely represented that CFS had a proven track record in collections and that historically CFS's actual collection performance exceeded its cash flow requirements.

209.    The SMART and GREAT marketing materials, prepared and reviewed by CFS executives and Professionals, including Mayer Brown, emphasized that CFS's collection performance in past SMART transactions exceeded the relevant Base Case and Stress Case cash flow requirements.  The PPMs for the SMARTs and GREATs and/or due diligence materials provided to potential investors included charts and graphs that compared CFS's actual collection performance on each prior securitization to the Base Case and Stress Case cash flow requirements for that securitization.  These charts and graphs showed that CFS was meeting on a cumulative basis – and was close to meeting on a monthly basis (except for March 1997 and

March 1998) – the Base Case and Stress Case cash flow requirements for each securitization, without disclosing the basis for the underlying numbers.

210.    Because rating agencies and investors were told that CFS's Base Case and Stress Case cash flow models were based on CFS's own collections rather than on monies received from Loan Sales, the comparison of CFS's "collections" (which included monies received from other sources, such as Loan Sales) to numbers generated by the Base Case and Stress Case cash flow models (which did not include such revenue) affirmatively misled rating agencies and investors, including Plaintiffs, into believing that CFS's "collections" numbers reflected only monies received through CFS's own collections operations. Unknown to rating agencies and investors, including Plaintiffs, these comparisons were materially false and misleading because they did not compare numbers generated based on the same assumptions. Rating agencies and investors, including Plaintiffs, were not told that CFS depended on Loan Sales to close the gap between its collection performance and its Base Case and Stress Case cash flow requirements.

211.    Mayer Brown knew that CFS's historical collection performance was material to the rating agencies, Plaintiffs and other investors. Mayer Brown knew, or recklessly disregarded facts that would have given rise to knowledge, that if CFS did not meet Base Case and Stress Case on a cumulative basis, and did not consistently meet or approach Base Case and Stress Case on a monthly basis, then CFS could not continue the securitizations.

212.    Mayer Brown knew, or recklessly disregarded facts that would have given rise to knowledge, that CFS's failure to meet its cash flow requirements through its collections on the Loans undermined the validity of its ECR valuation model and its ability to realize its Residual in the Loans, and thus the truthfulness of representations being made to investors, including Plaintiffs, by CFS executives and Professionals, including Mayer Brown.

213.    Mayer Brown knew, or recklessly disregarded facts that would have given rise to knowledge, that the rating agencies, investors (including Plaintiffs) and potential investors were misled into believing that CFS's "collections" numbers reflected CFS's own sophisticated, unique debt collection techniques when, in fact, they did not.

**The Representations Concerning CFS's Collection Performance Were Materially False and Misleading – CFS Resorted to Selling Loans to Meet Monthly Cash Flow Requirements**

214.    The representations in the PPMs, due diligence books and other written communications with rating agencies and investors concerning CFS's historical collection performance and its ability to meet Base Case and Stress Case requirements were materially false and omitted to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading, for the following reasons:

(a) As early as September 1996, CFS could not meet Base Case cash flow requirements on a monthly basis on SMART 96-2 and SMART 96-3 through its own collections, and disguised the shortfalls by including the cash proceeds it received from its return of certain of the Loans to the credit card issuers ("**Puts**") in its "collections" numbers even though the transaction documents in those securitizations did not treat Puts as "collections."

(b) Beginning at least in January 1997 and continuing through September 30, 1998, on or about the last day of almost every month, CFS resorted to selling Loans from many of the Trusts for millions of dollars to give investors false assurance that its collection numbers met Base Case and Stress Case requirements.

(c) From January 1997 through August 1997, CFS sold to Cadle, Inc. ("**Cadle**"), an entity unaffiliated with CFS, performing Loans in each securitization for an amount below the ECR value CFS had assigned to those Loans. Selling performing Loans in this fashion left CFS with a higher percentage of nonperforming Loans that were more difficult to collect than the performing Loans it sold, diminished the value of the Loan portfolios securing the outstanding Notes and put at risk CFS's ability to repay principal and interest to investors.

(d) As of January 1997, CFS was able to "meet" its Base Case cash flow requirements on SMART 96-2 and SMART 96-3 only by making Loan Sales and including the proceeds of Loan Sales in its "collections" numbers.

(e) CFS's ECR model did not reasonably value the amount of cash that CFS could collect on the Loans, and CFS's collections did not support the representation that CFS would earn a Residual on the Loan portfolios.

(f) As of September 1997, CFS was selling Loans to an affiliated entity, i.e., Dimat.

(g) As of September 1997, CFS was, in fact, servicing loans for an entity other than the Trusts, i.e., Dimat.

215.    Chase Securities, CFS's investment banker, and its placement agent or underwriter for the Securities beginning with SMART 97-3, has admitted that if CFS was, in fact, using the proceeds of Loan Sales to close the gap between CFS's actual collections and its Base Case and Stress Case cash flow requirements, this was a material fact that should have been disclosed to investors. Chase Securities also admits that investors were told that CFS did not include proceeds of Loan Sales in its reported collection numbers.

**CFS's President Resigned Because He Knew That CFS's Business Model Did Not Work, A Fact That Mayer Brown Knew, Or But For Its Recklessness Should Have Known, But Failed to Disclose to Investors**

216.    In January 1997, CFS hired Mitchell Vernick as its new President. By May 1997, Vernick realized that CFS failed to generate sufficient collections to meet Base Case and Stress Case requirements on existing securitizations and that the number of performing loans CFS claimed it had converted from nonperforming to performing (or to "set up" status) were defaulting at an increasing rate each month – in other words, that CFS's business model did not work.

217.    In May 1997, Vernick wrote:

As each week that I have been at CFS has past [sic], I have grown increasingly concerned about the viability of our securitization model. . . . After observing some of the organizational ineffectiveness in Credit, I hoped that re-engineering would explain the continued and growing miss from Base Case performance. However, as I have recently focused on the trends in every securitization and compared this to the increasing levels of performance required in the Base Cases, I am convinced that no amount of improvement in productivity can offset this

growing differential. Assuming there continues to be a market to sell performing loans to, part of this differential can be offset for a while, but it prematurely consumes cash flow that will create a larger deficit later in the life of the securitization. While I believe there is a way to improve total collections from the track they are on today through a combination of re-engineering, better management, and more favorably timed asset sales in relation to market conditions, I do not believe this can come close to Base Case projections, either in terms of monthly timing or collections in total. I am not certain if even the Stress Case can be made over the life of the securitization, as the collectability of assets two, three, and four years out is very unclear given the fall-off in new transactions even six months into securitizations.

Given my concerns about the performance of securitizations, I am no longer comfortable representing to investors that they are making a risk-reward decision they will be repaid in full. I realize that making such statements to investors would cause transactions to either not be rated or have the advance rate reduced to the point where no cash could be taken-out of the deal. If CFS cannot create cash by doing new deals, it will not be able to fund current overhead and will need to make drastic cuts in expenses in order to live within the cash flow from servicing fees.

*    *    *    *

Given my conclusion, I can no longer lead the company under the present operating model. Therefore, I believe I must resign immediately, as it is unfair to you and to investors to remain, given my views. … [T]his is an issue of professional integrity – something I must do, unhappy as it is for me, to maintain my professional integrity. . . .

218.    On or about May 27, 1997, Vernick advised Bartmann of each of the concerns he expressed in the letter quoted above. Vernick also advised Bartmann that he could not remain at CFS if CFS continued to sponsor additional securitizations. On the same day, Bartmann told Kravitt of his conversation with Vernick.

219.    Kravitt consulted with at least two other Mayer Brown partners, including a litigation attorney, and immediately flew to Tulsa to meet with Vernick. During May 28 and 29, 1997, Kravitt and another Mayer Brown attorney met with Vernick to discuss his concerns.

220.    During the May 28-29 meetings, Vernick told Kravitt and his partner in detail the concerns he had expressed in the draft resignation letter quoted above. Upon information and

belief, Vernick showed Kravitt and his partner a chart dated May 2, 1997 which indicated that, as of September 1996, CFS was failing to make its Base Case cash flow requirements on SMART 96-2, 96-3 and 96-4, and that it included Puts and proceeds of Loan Sales in its "collections" numbers, disguising its failure to meet Base Case cash flow requirements for these securitizations. In July 1997, an unidentified Mayer Brown attorney, in describing what Vernick had told Kravitt and other Mayer Brown lawyers, wrote: "Mitch showed chart that breaks CF [cash flow] into components ... settlements[,] puts and conversion rates." Next to the words "conversion rates," in the attorney's handwriting are the words "disguised by sales."

221.    The chart described in the immediately preceding paragraph, which was in Mayer Brown's files, also showed that: (a) with respect to SMART 96-2, for the months of January, February, and April 1997, the proceeds of Loan Sales made up 33%, 45% and 52% respectively of Base Case cash flow for those months; (b) with respect to SMART 96-3, for the months of January, February, and April 1997, the proceeds of Loan Sales made up 9%, 39% and 32% respectively of Base Case cash flow for those months; and (3) with respect to SMART 96-4, for the month of April 1997, the proceeds of Loan Sales made up 43% of Base Case cash flow. The chart also showed that CFS failed to meet Base Case requirements on SMART 96-2 and 96-3 in March 1997 because it did not make any Loan Sales that month.

222.    Mayer Brown never disclosed to investors in subsequent PPMs or otherwise the adverse material facts it learned from Vernick, even though Mayer Brown knew that disclosure had to be made regarding Vernick's departure. Thus, on a page of handwritten notes, Kravitt wrote the following:

> Resignation of MV [Mitchell Vernick] in PPM or Oral
> inherently misleading: better orally

223.    Vernick submitted his resignation to Bartmann on May 30, 1997 in a memo that stated that Vernick purported to be resigning "[a]t your request."  From their discussions with Vernick, Bartmann and Kravitt had reason to believe that Vernick would resign of his own accord if CFS did not cease its securitizations and respond to the issues he had raised, such that CFS would not be obligated to pay Vernick $10,000,000 under his employment contract.  Kravitt and Bartmann nevertheless agreed to characterize Vernick's departure as a termination without cause and to pay Vernick $10,000,000 "less any additional compensation paid," which was payable under his employment contract only if Vernick was "terminated without cause."

224.    In June 1997, Vernick received his $10,000,000 "less any additional compensation paid" (amounting to over $9,000,000 in cash) and reaffirmed his confidentiality agreement with CFS, prohibiting him from disclosing confidential business information concerning CFS without prior permission from CFS.

225.    Even though Vernick had shown Mayer Brown objective evidence of CFS's failure to make its Base Case cash flow requirements in its existing securitizations without including the proceeds of Puts and proceeds of Loan Sales in its "collections" numbers, Mayer Brown proceeded with SMART 97-4, the next securitization, without disclosing to rating agencies or investors the deficiencies in CFS's collections performance identified by Vernick.

226.    That Mayer Brown knew that Vernick's conclusions were correct regarding CFS's dependence on Loan Sales to make Base Case is demonstrated by Kravitt's handwritten note dated May 31, 1997, immediately after his meetings with Vernick.  On a chart entitled "SMART 96-2 Cumulative Contribution Cash Flow as a Percentage of Base Case and Stress Case for months 1-12," Kravitt wrote "How much sales."  On June 29, 1997, Kravitt's handwritten notes on the section of the SMART 97-4 entitled Credit and Collection Policy state:

"We should disclose ability of Servicer to Sell the Loans, limits on it, policies how to decide, etc." Likewise, Mayer Brown notes dated July 7, 1997 regarding the PPM for SMART 97-4, the first securitization after Vernick's "resignation," state: "Sale of loans and how to disclose JK?!"

227.    Although the PPMs for SMART 97-4 and subsequent SMART and GREAT securitizations disclosed that CFS could sell limited amounts of Loans under certain limited circumstances, they did not disclose that CFS was, on a monthly basis, selling Loans in virtually all of its existing securitizations and that CFS used the proceeds of those Loan Sales to close the gap between its Base Case and Stress Case cash flow requirements and its actual collections on the Loans. In addition, these PPMs did not disclose the fact that Loan Sales had become a part of CFS's regular operations in meeting its Base Case and Stress Case cash flow requirements, and did not describe any of the policies or procedures CFS used to determine which Loans to sell and how much to sell.

228.    Mayer Brown knew that the reasons underlying Vernick's sudden resignation were material to potential and existing investors. On June 26, 1997, a Mayer Brown attorney prepared a draft memorandum and sent it to Caroline Benediktson, CFS's general counsel, copying Kravitt and another Mayer Brown attorney, listing various "options" for wording the disclosure to be made to investors in the SMART 97-4 PPM concerning Vernick's resignation:

> At the request of the Chairman of the Board of CFS, effective May __, 1997, Mr. Mitchell __ Vernick resigned his position as Chief Executive Officer of the Company. Both the Chairman of the Board of CFS and Mr. Vernick considered his resignation appropriate in light of his disagreements between them relating to a variety of issues concerning the Servicer's business, including, the management of its personnel and facilities and [the value of certain loans serviced by it] [the likely performance of certain loan portfolios serviced by the Servicer] [the efficacy of it servicing practices] [the likelihood that the Servicer will continue to meet specified collection  benchmarks with respect to certain loan pools] [the collectability of certain loans serviced by the Servicer].

229.    The PPM for SMART 97-4, prepared by Mayer Brown, failed to disclose the true reasons for Vernick's departure. The PPM blandly and misleadingly stated only that Bartmann and Vernick had "different perspectives and opinions relating to a variety of issues concerning the business of CFS, including, among other things, the management of the collection process, its capital market strategy and the value of the assets serviced by it." Each subsequent PPM for the SMARTs repeated this misleading "disclosure" until the PPM for GREAT 98-A, when even that "disclosure" disappeared.

230.    Like the PPM for SMART 97-4, the PPMs for each subsequent securitization failed to disclose the truth about Vernick's departure and that Vernick had received a payment of approximately $10,000,000 to which he was entitled only if he was terminated without cause. The PPM for SMART 97-4 and the PPMs for all subsequent securitizations also failed to disclose that CFS had resorted to Loan Sales to "meet" its Base Case and Stress Case requirements. Mayer Brown knew, or recklessly disregarded facts that would have given rise to knowledge, that as a result of these omissions, the disclosures made to rating agencies and investors regarding Vernick's departure were rendered materially misleading.

231.    That Mayer Brown recognized that a disclosure that Vernick had been paid $10,000,000 was material and had serious implications is evidenced by the fact that on September 28, 1997, an unknown Mayer Brown attorney working on a draft prospectus for the Planned IPO of CFS wrote that Vernick "may have been paid off $10 million to leave." Mayer Brown's draft IPO Prospectus dated October 28, 1997 also disclosed the $10,000,000 payment to Vernick in its discussion of Vernick's departure from CFS, indicating the materiality of this fact in the minds of the Mayer Brown attorneys who drafted that document.

**CFS's Loan Sales Were Not Disclosed To Investors**

232.   Mayer Brown, and CFS executives and other Professionals, disclosed for the first time in the PPM for SMART 97-4 that the Servicing Agreements permitted CFS to make a limited amount of Loan Sales:

> Under the Sale and Servicing Agreement, the Servicer <u>may offer to sell a Loan</u> to any third party if the Servicer determines that such a sale is consistent with the Servicing Standards and in the best economic interest of the Issuer and the Holders. The Servicer may not, however, sell any Loan to the Trustee or an affiliate or to itself or any of its affiliates.

But, the PPMs for SMART 97-4 and subsequent securitizations failed to disclose: (a) that CFS had already been making Loan Sales in prior securitizations and that CFS depended on Loan Sales to close the gap between its collections and the cash flow requirements established for the Trusts; (b) that the Loan Sales were not "in the best economic interest of the Issuer and the Holders," but rather were done to disguise CFS's failure to meet its cash flow requirements in accordance with its highly touted "Credit and Collection Policy;" (c) that Loan sales had become a material part of CFS's business model; and (d) the procedures and policies CFS used for determining which Loans to sell and how much to sell. Mayer Brown knew, or recklessly disregarded facts that would have given rise to knowledge, that as a result of these omissions, the disclosures made to rating agencies and investors (including Plaintiffs) regarding Loan Sales were rendered materially misleading.

233.   Mayer Brown knew, or recklessly disregarded facts that would have given rise to knowledge, that CFS could not repay investors solely from its own collections on the Loans, that CFS needed to sell Loans to meet its Base Case and Stress Case cash flow requirements, and that CFS could not continue its operations without quickly raising additional cash (e.g., through an initial public offering) as evidenced by the following:

(a) its conversations with Bartmann in May 1997 regarding Vernick's concerns;

(b) its meetings with Vernick in May 1997 regarding his concerns and his intended resignation;

(c) its knowledge obtained in May 1997 that CFS used Puts and Loan Sales to "fill the gap" on Base Case requirements on the SMART 96-2, 96-3, and 96-4 securitizations;

(d) its knowledge obtained in May 1997 that CFS had been selling performing Loans and that this endangered the long term viability of existing securitizations;

(e) its knowledge obtained in May 1997 that CFS had missed its March 1997 collection requirements because it did not sell Loans that month; and

(f) the reopening of its file regarding a possible IPO on September 26, 1997, and the preparation of the first draft of a Prospectus for the IPO on September 28, 1997, just five days after CFS's first Loan Sales to Dimat.

## In September 1997, CFS Started Making Sham Loan Sales to Dimat

234.    By September 1997, CFS could no longer attract unaffiliated third-party purchasers for the Loans.  On or about September 18, 1997, Cadle told Bartmann that it would no longer buy Loans from CFS.  This was less than two weeks before $190,000,000 of SMART 97-5 Notes were to be sold to investors, including certain Plaintiffs.  CFS knew that without Loan Sales in September 1997, it would have to announce that it had missed Base Case on several of its securitizations by a large margin for the second time in 1997 (the first time being March 1997 when no Loan Sales occurred), which would undermine the sale of SMART 97-5 Notes and jeopardize CFS's ability to stay in business.

235.    Beginning in September 1997, and continuing until September 30, 1998, CFS "sold" Loans from several of the SMARTs to Dimat, an entity incorporated by James Sill, an attorney in Shawnee, Oklahoma.  Dimat was incorporated on September 22, 1997, just days before its first purchase of Loans in the amount of $3.97 million, the amount needed to meet CFS's "collection" goals for September on a number of the existing SMARTs.  Mayer Brown

knew that CFS was selling Loans to Dimat and that it continued to service the Loans sold to Dimat and received a servicing fee from Dimat.

236.    Dimat was owned, funded and controlled, directly or indirectly, by Bartmann and Jones and, therefore, was an affiliate of CFS.

237.    On September 29, 1997, virtually the same day as CFS made its first Loan Sales to Dimat, Benediktson received at Mayer Brown's Chicago offices a draft of the Asset Sales Agreement between CFS and Dimat by fax care of a Mayer Brown attorney. The fax cover sheet states, in part, as follows:

> September Sale Agreements – attached is one of the sale agreements that was copied from the August Sale Agreement. Please look over and if o.k. I'll copy for the other 4 agreements. The only change will be the money amount.

238.    On that same day, Bartmann authorized CFS's bank to advance $4,187,000 from CFS's tax reserve account to Jones' Calamity Jones Entertainment, Inc. account. Jones forwarded this money to Dimat to facilitate Dimat's first sham purchase of Loans from CFS.

239.    Mayer Brown needed to determine the circumstances under which CFS sold Loans to prepare the Application it submitted to the Securities and Exchange Commission on CFS's behalf seeking an exemption from registration as an investment company under the Investment Company Act of 1940. The following documents prepared by Mayer Brown for the Planned IPO demonstrate that it knew that CFS sold Loans to Dimat, that CFS serviced loans for Dimat contrary to representations in the PPMs that CFS did not service for third parties, and that CFS used the proceeds of these Loan Sales, as it had used the proceeds of prior Loan Sales, to "fill the gap" between its actual collections and Base Case and Stress Case cash flow requirements:

a)    On October 2, 1997, just 2 days after the first Loan Sales to Dimat, a Mayer Brown attorney prepared a memorandum that discussed CFS's ability to qualify for

exemption under Rule 3a-7 of the Investment Company Act of 1940, a prerequisite for the Planned IPO. As part of its due diligence for the Planned IPO, Mayer Brown investigated the extent to which CFS sold Loans rather than collect on them for the Trusts. Referring to the Loan Sales, the Mayer Brown attorney wrote: "Rule 3a-7 flatly prohibits trading [for the purpose of generating gains or decreased losses], and we are not aware of any authority that permits even a de minimis exception to that prohibition."

b)  A draft IPO prospectus dated October 12, 1997 has the words "Comerica Diamet" [sic] next to the phrase "Effective in 1995, the Company ceased servicing loans on a third party contingency fee basis." Similarly, the word "Diamet" is handwritten next to the section that states, "The Company buys receivables only for its own account and does not service or collect for third parties, except . . . the receivables in eight outstanding securitizations that it has sponsored." This evidences Mayer Brown's knowledge that the quoted statement was rendered false by the fact that CFS was continuing to service the Loans it "sold" to Dimat.

c)  An October 14, 1997 draft of the IPO Prospectus revising the October 12, 1997 draft quoted above, a copy of which was sent to Cardine Benediktson, CFS's general counsel, and Mike Temple, CFS's Chief Financial Officer, and reviewed by Kravitt, states:

> The company <u>currently</u> buys receivables only for its own account and does not service or collect for third parties [Diamet?], except that the Company services the receivables in the eight outstanding securitizations that it has sponsored and will do so in its future securitization (emphasis in original).

d)  An October 14, 1997 draft of a Mayer Brown opinion letter relating to whether CFS could qualify for an exemption under Rule 3a-7 of the Investment Company Act, the author of which is unknown at this time, states "we need to be able to say with confidence that the pools are not something actively 'traded.' Because there is no retail trading market for the pools of credit card receivables, and they are not packaged as 'investments' [confirm]" (Underlining and brackets in original).

e)  An October 16, 1997 draft of the same opinion letter says, "[Mayer Brown attorney]: J. also mentioned that CFS may break little bits of a pool of the Receivables off for sale in smaller increments; we will need to address that, I think in a footnote basically saying that those cases represent an insignificant part of the transaction and certainly does not represent the motivation to purchase a pool. We will also need to explain the circumstances for breaking off and selling the little fragments."

f)  An October 20, 1997 draft of the IPO prospectus was revised further to state:

> Effective in 1995, the Company generally ceased providing asset disposition or management services for third parties, and generally does not service loans on a third party, contingency fee basis, except in

connection with Company-sponsored securitizations [and occasionally for other third parties as a result of sales of loans serviced under the Company-sponsored securitizations.] (brackets in original)

g)  In an October 26, 1997 memorandum to Kravitt, two Mayer Brown attorneys, recognized the futility in CFS continuing to argue that CFS's Loan Sales were minimal and that it could possibly obtain a Rule 3a-7 exemption. Unidentified handwritten notes in the margin of a Mayer Brown attorney's memorandum demonstrate that Mayer Brown was looking into and was aware of the extent of CFS's Loan Sales. The notes state: "(is 1 out of 8) – primarily engaged?"

h)  In the October 26, 1997 memorandum, the same two Mayer Brown attorneys stated that the argument that Loans Sales were not CFS's "primary purpose" was "too myopic of a perspective" on CFS's activities. Recognizing that the argument for an exemption under Rule 3a-7 was untenable, one of these attorneys wrote:

> I continue to be concerned that people are being influenced by zealous advocacy for the client, fatigue, overwork and the stature of the main protagonist within the firm.

i)  On October 30, 1997, a Mayer Brown attorney, whose identity is unknown at this time, wrote:

> Caroline says that the Co. will not do an IPO if they can't sell out of the Trust. ... Warehouse entity ... receivables are dividended up to CFS ... Buys $10 face amt acct. for $1 ... ECR is $3 ... securitized for $1.80 (this is what the trust paid for the receivable) ... if sold out of the securitization, may be sold for $2.00 (?) ....
> <u>* Note for Prospectus - may need to disclose that, from time to time, the trust in a given securitization may sell some of its performing receivables in order to meet the monthly collection targets.</u>"  (Emphasis supplied)

j)  On November 11, 1997, Kravitt, in a draft outline of a presentation to the Securities and Exchange Commission, stated that one of the "strengths" of a particular strategy was that "SMARTS could continue to sell receivables."

k)  On July 24, 1998, Mayer Brown filed with the SEC, on CFS's behalf, a draft Amendment and Restatement No. 1 to Application for an Order Pursuant to Section 6(c) of the Investment Company Act, which says, "The Applicant acknowledges that each Securitization Issuer must, on a stand-alone basis, qualify for an exception to the 1940 Act's definition of an investment company. To date, certain of the Securitization Issuers have qualified under Section 3(c)(1), others under Section 3(c)(7)(A) and others under Rule 3a-7 under the 1940 Act." Given that Rule 3a-7 forbids asset sales, Mayer Brown could only make this statement if it had determined which of the CFS Trusts qualified under each particular Investment Company Act

exemption and which Trusts were not exempt under Rule 3a-7 because CFS was making Loan Sales out of those Trusts.

**Mayer Brown Knew, Or But For Its Reckless Failure to Make Further Inquiry Would Have Known, That CFS's Business Model Was Not Viable And That CFS Was Using Its Own Funds To Disguise Collection Shortfalls In Its Securitizations**

240.    Having been put on notice by Vernick of the fact that CFS was using the proceeds of Loan Sales to close the gap between its collections and the Base Case and Stress Case cash flow requirements, and that the practice was continuing on a monthly basis, Mayer Brown, prior to issuing its opinion letters and preparing the PPMs and other transaction related documents, had a duty to conduct a reasonable inquiry into the facts and circumstances under which such Loan Sales were occurring – including their frequency and their amounts – and whether CFS's business model as represented to Plaintiffs and other investors remained viable.

241.    Based on the facts known to Mayer Brown as set forth above, a reasonable inquiry by Mayer Brown would have disclosed that CFS's Loan Sales, including its sham Loan Sales to Dimat, were intended to mislead investors into believing that CFS was meeting Base Case and Stress Case requirements, in light of the following facts, among others:

    (a) The Loan Sales to Dimat occurred at the end of each month and equaled the amount CFS needed to close the gap between actual collections and the amounts needed to meet the Base Case and Stress Case requirements for each securitization.

    (b) Jones, through Sill, created Dimat almost on the very day that it began purchasing Loans from the Trusts for millions of dollars, and when making Loan Sales to an affiliated third-party violated the covenants in the transaction documents.

    (c) CFS "sold" Loans to Dimat for an amount well above what CFS itself estimated it could collect on the Loans, which is economically irrational, particularly since CFS continued to service the Loans for Dimat.

    (d) The servicing agreements between Dimat and CFS, some of which were not signed at the time the "sales" occurred, did not require CFS to report to Dimat the collection performance on the Loans purchased by Dimat.

    (e) Dimat had no assets other than the Loans it purchased from CFS.

(f) Bartmann and CFS financed Dimat's $63 million purchases of Loans by transferring the money to Jones, purportedly in exchange for Jones's CFS stock and as distributions on the stock he retained. Jones then transferred the money to Dimat, which used the money to purchase Loans from the Trusts. The amounts "paid" by Bartmann and CFS to Jones equaled the amounts CFS needed to disguise its failure to "meet" its cash flow requirements.

(g) March 1998, when CFS reported that it had failed to meet its cash flow requirements by a substantial amount, was the only month between September 1997 and September 1998 in which CFS had made no cash advances to Jones and Bartmann, Bartmann bought none of Jones's stock, and CFS made no Loan Sales to Dimat.

**Mayer Brown Knew, Or Recklessly Disregarded Facts That Would Have Given Rise To Actual Knowledge, That Full Disclosure Would Have Halted the Securitizations**

242.    The documentation relating to the Planned IPO also demonstrates that Mayer Brown knew, or recklessly disregarded facts that would have given rise to knowledge, that CFS's ECR model failed to reflect its actual collections experience. On December 22, 1997, a Mayer Brown lawyer wrote a memorandum to Bartmann and Benediktson regarding the options facing CFS with respect to the Planned IPO. He stated as one of the "pro" points of delaying an IPO that it "[G]ives CFS time to build additional track record with securitization model (or to modify model now), enhancing future acceptance of model by investment bankers." The same lawyer suggested that one of the steps CFS could take to promote the IPO in the future was "[C]onsider revising Estimated Cash Recovery model to reflect CFS's actual collection experience."

243.    Mayer Brown intentionally or recklessly concealed the critical problems with CFS's collection operation from investors and prospective investors, including Plaintiffs. Instead of accurately disclosing CFS's collection performance, or that the ECR Model did not reflect CFS's actual collections experience, Mayer Brown continued to represent that CFS had superior debt collection experience and abilities and was meeting its cash flow requirements. When it turned to Loan Sales to disguise its inadequate collection performance, CFS and its

executives and Professionals, including Mayer Brown, failed to disclose to Plaintiffs and other investors why it needed to make Loans and the extent of such sales. If the truth regarding the Loan Sales had been revealed, CFS and its executives and Professionals, including Mayer Brown, could no longer have described CFS as the premier debt collector to ratings agencies and investors, and could not have continued selling the Notes to Plaintiffs and other investors.

244.    Mayer Brown knew from the inception of the securitization program that the transaction documents did not treat proceeds of Loan Sales as collections and knew, or recklessly disregarded facts that would have given rise to knowledge, that reporting proceeds of Loan Sales as collections constituted an untrue statement of a material fact or an omission to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

245.    Mayer Brown's knowledge that full disclosure of material aspects of CFS's operations and the inadequacy of its business model would have brought the securitizations to a halt is further demonstrated by Kravitt's handwritten notes in the margin of a September 11, 1997 memo from two Mayer Brown lawyers discussing "CFS Alternative Structures" in connection with CFS's interest in becoming directly involved in issuing credit cards. While acknowledging that the purpose of their memo was to "develop a structure which limits the extent to which CFS's activities will be effected [sic] by bank regulations," Mayer Brown lawyers recognized that credit card loans can only be made "through a national bank or federal savings association." Next to a statement in the memo that "CFS as a subsidiary of a Bank or thrift, will be subject to the full examination requirements of the appropriate federal regulator," Kravitt wrote the word "death."

**The GREAT Transactions**

246.    In or about May 1998, CFS executives and Professionals contacted Plaintiffs and other investors to persuade them to exchange their SMART Notes for new notes to be issued by a "Master Trust" called "GREAT 98-A." Plaintiffs and other investors were told that CFS needed a Master Trust because of operational difficulties in servicing many separate SMARTs. The PPM for GREAT-A also stated that many credit card obligors had multiple credit cards debts in various SMARTs which purportedly complicated compliance with the Fair Debt Collection Practices Act. CFS executives and Professionals stated that aggregating all the credit card debt attributable to a single obligor in one master trust would eliminate this problem and improve efficiency. The GREAT 98-A Master Trust also purportedly was designed to permit CFS to add newly acquired Loans over time.

247.    CFS executives and Professionals failed to disclose that one purpose for the GREAT 98-A, if not the main purpose, was to continue to conceal the failure of CFS's actual collection performance.

248.    The GREAT 98-A closed on June 30, 1998 and issued approximately $736 million in notes, which Plaintiffs and other investors purchased for cash or by exchanging earlier acquired SMART Notes for GREAT Notes. As they had in the SMART offerings, certain CFS executives, Mayer Brown, and other Professionals made representations in the GREAT PPMs, due diligence materials and in other written and oral communications about CFS's purportedly superior debt collection ability and failed to disclose that CFS had been selling Loans to meet Base Case and Stress Case requirements on certain SMART securitizations.

249.    In marketing and issuing the GREAT Notes, CFS executives, other Professionals and Mayer Brown failed to disclose among other things (a) the problems with CFS's collections

and its almost two-year history of failing to meet Base Case and Stress Case cash flow requirements through its own collections, (b) CFS's inclusion of the proceeds of Loan Sales to Cadle and Dimat in its "collections" numbers to disguise its failure to meet Base Case and Stress Case cash flow requirements through its own collections, and (c) the ineffectiveness of CFS's ECR model in valuing the Loans. Mayer Brown knew, or recklessly disregarded facts that would have given rise to knowledge, that as a result of these omissions, the material disclosures made to rating agencies and investors regarding the GREAT Notes were rendered false or misleading.

**Mayer Brown's Opinion Letters**

250.    In connection with each securitization, Mayer Brown was required to and did provide legal opinion letters addressed to the rating agencies, and investors and their advisors and agents, including Plaintiffs, on a number of issues relating to the securitizations. For example, Section 9 of the Note Purchase Agreement dated August 6, 1997 for SMART 97-4 entitled "Conditions of Your Obligations," provided :

> Prior to or on the Closing Date, each of you shall have received from Mayer, Brown & Platt, counsel for the Issuer, . . . and CFS, opinions in form and substance reasonably satisfactory to you and your special counsel and covering such matters as you and your special counsel shall reasonably request, each addressed to you and dated the Closing date.

The purchase agreements for all subsequent securitizations contained a substantially similar requirement.

251.    Mayer Brown intended to induce reliance by the rating agencies and Plaintiffs and other investors in the CFS-sponsored securitizations on the advice provided in its opinion letters, and knew that in the absence of such opinion letters, the securitization transactions could not have occurred.

252.    One of the issues on which Mayer Brown opined (in what has been referred to herein as a "Rule 10b-5" letter) was whether any facts had come to its attention to lead it to believe that the PPMs contained false statements of material fact or omitted to state material facts necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. On August 6, 1997, for example, Mayer Brown provided such a letter regarding SMART 97-4 ("August 6, 1997 Rule 10b-5 Letter"), addressed directly to Plaintiffs and/or their investment advisors and agents in connection with their investment in the Notes.

253.    The August 6, 1997 Rule 10b-5 Letter provides:

In connection with the delivery of this letter, we have examined and relied upon the [Private Placement Memorandum] and executed copies of the [Private Placement Agency Agreement] and the Basic Documents, and originals or copies, certified or otherwise identified to our satisfaction, of such certificates and other documents as we have deemed appropriate for the purposes of delivering this Letter.

*        *        *

As indicated above, we have examined various documents and records and participated in conferences with your representatives and the representatives of CFS ..., at which time the contents of the Memorandum and related matters were discussed, and, on behalf of CFS ..., we have participated in the preparation of the Memorandum. We have also examined the opinions and the documents delivered at the closing. However, we are not passing upon and assume no responsibility for the accuracy, completeness or fairness of the statements contained in the Memorandum. Subject to the foregoing, we advise you that no facts have come to our attention which lead us to believe that as of its date, the Memorandum (other than the financial and statistical data included or not included therein, as to which we express no opinion) contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading [emphasis added].

254.    On August 6, 1997, Mayer Brown sent another opinion letter concerning "Certain Matters as to Nonconsolidation with Shareholders" ("August 6, 1997 Nonconsolidation Letter"), addressed to Plaintiffs and/or their investment advisors and agents, and the rating agencies (Duff

& Phelps Credit Rating Co., Fitch Investors Service, L.P., and Standard & Poors Rating Service). As with the August 6, 1997 Rule 10b-5 Letter, Mayer Brown intended that the rating agencies, Plaintiffs, and/or their investment advisors and agents rely on the statements contained in and the accuracy of the August 6, 1997 Nonconsolidation Letter, and knew that in the absence of the letter, SMART 97-4 would not have closed.

255.    The August 6, 1997 Nonconsolidation Letter provides that Mayer Brown relied and assumed that "there has been no (and there will not be any) fraud in connection with any of the Transactions [emphasis added]." This constituted a representation that Mayer Brown was aware of no facts that could render its reliance and assumption unreasonable or inappropriate. This representation was false and misleading because as detailed above, Mayer Brown had knowledge, or recklessly disregarded facts that would have given rise to knowledge, of fraud in connection with SMART 97-4 and subsequent SMART and GREAT transactions.

256.    On August 6, 1997, Mayer Brown also sent another legal opinion letter addressed to Plaintiffs and/or their investment advisors and agents, and the rating agencies regarding certain tax matters relating to the SMART 1997-4 securitization ("August 6, 1997 Tax Letter"). Mayer Brown intended that Plaintiffs and/or their investment advisors and agents and the rating agencies rely on the statements contained in and the accuracy of the August 6, 1997 Tax Letter and knew that in the absence of such letter, SMART 97-4 would not have closed.

257.    The August 6, 1997 Tax Letter provided that Mayer Brown had "examined a copy of the (i) Indenture, (ii) the Sale and Servicing Agreement. . .; and (iii) the Private Placement Memorandum for the sale of the Notes. . . . dated August 6, 1997." The letter also stated that Mayer Brown's "opinion is based on the terms of the Indenture, the Sale and Servicing Agreement and the Private Placement Memorandum." This constituted a representation that

Mayer Brown was aware of no facts that could render its reliance on the Indenture, the Sale and Servicing Agreement and the PPM unreasonable or inappropriate and therefore that Mayer Brown was aware of no facts that could render the documents false or misleading. This representation was false and misleading because as detailed above, Mayer Brown knew, or recklessly disregarded facts that would have given rise to knowledge, of fraud in connection with SMART 97-4 and subsequent SMART and GREAT transactions.

258.    On August 6, 1997, Mayer Brown sent to Plaintiffs and other investors and the rating agencies a legal opinion letter regarding certain Investment Company Act matters relating to SMART 97-4 ("August 6, 1997 Investment Company Act Letter"). Mayer Brown intended that Plaintiffs and/or their investment advisors and agents and the rating agencies rely on the statements contained in and the accuracy of the August 6, 1997 Investment Company Act Letter and knew that in the absence of such a letter SMART 97-4 would not have closed.

259.    The August 6, 1997 Investment Company Act Letter provided that Mayer Brown reviewed a number of documents relating to SMART 97-4 and represented that it relied on the fact that "there has not been any fraud, duress, undue influence or material mistake of fact in connection with the Transactions …. [and] we have not undertaken any independent investigation to determine the existence or absence of such facts and no inference as to our knowledge concerning such facts should be drawn from the fact that such representation has been taken by us." This constituted a representation that Mayer Brown was aware of no facts that could render its reliance unreasonable or inappropriate.

260.    As set forth in detail above, Mayer Brown knew, or recklessly disregarded facts that would have given rise to knowledge, that its opinion letters issued in connection with SMART 97-4 and all subsequent securitizations contained untrue statements of material fact or

omitted to state material facts necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

261.    Mayer Brown provided opinion letters substantially similar in form and substance to the August 6, 1997 Rule 10b-5 Letter, the August 6, 1997 Nonconsolidation Letter, the August 6, 1997 Tax Letter and the August 6, 1997 Investment Company Act Letter for each subsequent securitization through and including GREAT 98-A and directly addressed those letters to Plaintiffs and/or their investment advisors and agents, and the rating agencies, as indicated in the following chart:

| **Transaction** | **Dates of Opinion Letters** |
|---|---|
| SMART 97-4 | August 6, 1997 |
| SMART 97-5 | September 29, 1997 |
| SMART 97-6 | December 10, 1997 |
| SMART 98-1 | February 27, 1998 |
| GREAT 98-A | June 30, 1998 |

262.    Mayer Brown knew, or but for its reckless disregard for the truth should have known, and omitted to disclose in its opinion letters, that the PPMs, due diligence material and transaction documents it prepared and that were provided to, and relied upon by, the rating agencies and Plaintiffs and other investors in connection with SMART 97-4 and subsequent securitizations were materially false and misleading in the following respects:

(a) By May 1997, Mayer Brown knew, or but for its reckless disregard for the truth, should have known, that CFS included the proceeds of Loan Sales in its "collections" numbers in the PPMs and due diligence material provided to investors and prospective investors, including Plaintiffs.

(b) By May 1997, Mayer Brown knew, or but for its reckless disregard for the truth, should have known, that CFS and its investment bankers were providing false information to investors and prospective investors and omitting to provide material information to disguise CFS's failure to meet its cash flow requirements on existing securitizations through its own collection performance.

(c) By May 1997, Mayer Brown knew, or but for its reckless disregard for the truth, should have known, that CFS had consistently failed to meet monthly Base Case requirements on SMART 96-1, 96-2 and 96-3 through its own collections and was including Puts and the proceeds of the Loan Sales in its "collections" numbers to mislead investors and potential investors, including Plaintiffs, into believing that CFS was meeting Base Case.

(d) As of May 1997, Mayer Brown knew, or but for its reckless disregard for the truth, should have known, the true reasons for Vernick's departure from CFS which were not disclosed to investors to mislead them regarding the purported ongoing and historical success of CFS's business model.

(e) As of May 1997, Mayer Brown knew, or but for its reckless disregard for the truth, should have known, that the ECR model for valuing the Loans failed to predict the amounts that CFS could collect on the Loans.

(f) As of May 1997, Mayer Brown knew, or but for its reckless disregard for the truth, should have known, that the sale of Loans had become a material part of CFS's business and that this fact was not being disclosed to the rating agencies and investors.

(g) As of October 1997, Mayer Brown knew, or but for its reckless disregard for the truth, should have known, that CFS was making Loan Sales to Dimat.

(h) As of October 1997, Mayer Brown knew, or but for its reckless disregard for the truth, should have known, that CFS was servicing Loans for Dimat, even though the offering materials – including PPMs – for subsequent securitizations stated that CFS did not service Loans for third parties.

(i) As of October 1997, Mayer Brown knew, or but for its reckless disregard for the truth, should have known, that CFS included the proceeds of the Loan Sales to Dimat in its "collections" numbers.

(j) As of October 1997, Mayer Brown knew, or but for its reckless disregard for the truth, should have known, that CFS made Loan Sales to Dimat each month in amounts just necessary to close the gap between its actual collections and its Base Case cash flow requirements.

(k) As of October 1997, Mayer Brown knew, or but for its reckless disregard for the truth, should have known, that Jones was funding Dimat's sham purchases of Loans for CFS with money he received from CFS and Bartmann, that Dimat was a shell company without any assets and that Jones and Bartmann were funneling money through Dimat to keep CFS afloat by deceptive means.

263.    In directly providing legal opinion letters addressed to Plaintiffs and/or their investment advisors and agents and to the rating agencies, with the knowledge that they would rely on such legal opinion letters, Mayer Brown had a duty of care to Plaintiffs. In affirmatively representing in these opinion letters that they were unaware that any representations and/or omissions in the PPMs and other documents relating to the securitizations were materially false or misleading, Mayer Brown breached its duty of care because it knew or recklessly disregarded facts that would have given rise to knowledge, that these affirmative representations were materially false and omitted to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

**The September 30, 1998 Anonymous Letter**

264.    On or about September 30, 1998, CFS's rating agencies received an anonymous letter stating in part that:

- Around 20% of all collections on the securitizations are coming from asset sales. In the last year, nearly all of them have been to a company called Dimat Inc. located in Shawnee Oklahoma. It was incorporated a few days before the initial purchase of receivables in September 1997. Why has no one in this industry ever heard of Dimat [?]. The company is paying 25-30 cents on the dollar. This is two or three times the market rate for regular receivables. Many of the sales occurred on the last day of the month and in an amount that just met the collection requirements of the securitization. In 1998, these sales have been of receivables that have an estimated cash recovery of zero. Why would a third party pay 30 cents for a 0% ECR asset? CFS continues to service these assets. If a third party purchased assets and continued to have the seller service these assets, wouldn't that company come and do a site visit? Dimat personnel have never toured the operation. Only the attorney for Dimat, James Sills ever contacts CFS. If a third party company purchased $60 million of charged off debt, why would they pay the same price for good assets in January and then skips in the summer? Why continue to pay three times the market rate when your total return is less than T-Bills? Why does CFS sell skips at 30 cents? Maybe due to the zero ECR of skips? Maybe restrictions on the percentage of asset sales based on ECR values. Why buy back securitizations as occurred in 1997 and why set up a master trust? Maybe the model works in the short run, but not the long term.

- About 70% of all set ups [converted accounts] are delinquent, but hardly any are ever defaulted. Why? They periodically become current over the weekend without payments ever being received. Interesting occurrence. Why does Jay Jones make modifications on the weekend, when no one is around? With a staff of 180 in IS, why does Jay come in to make changes by himself on the weekends?

- Why have senior managers left the company in the last year and a half reportedly with large severance packages? Why did CFS stop having management meetings when Dimat started buying receivables?

265.    On October 20, 1998, CFS issued a letter stating that it had engaged outside counsel to investigate the allegations and admitted that "there appears to be some basis for certain of the[ ] allegations" in the anonymous letter.

266.    Once the truth about CFS's poor performance and dependence on Loan Sales became known, CFS could not continue its securitizations, thereby ending the flow of new capital to CFS. The Notes also failed to maintain their investment-grade ratings. In downgrading the Notes, the rating agencies focused not on the mere fact of Loan Sales, but rather on CFS's dependence on Loan Sales to meet its monthly cash flow requirements. Duff & Phelps Credit Rating Service, for example, in its "Comments on Downgrade of CFS Asset-Backed and Corporate Unsecured Securities" dated October 23, 1998, stated:

> Through DCR surveillance reports, it had become apparent that the collections on certain pools of collateral, specifically the SMART 96-2, SMART 96-4, SMART 97-2 and SMART 97-3 were falling behind expectations. ... The shortfall in collection results was not independently alarming, given the cushion between what is referred to as the base and stress cases. ... [A]sset sales from SMART 96-2 to Dimat totaled over $12.3 million from September 1997 to September 1998. This amount represents 52 percent of all amounts collected from SMART 96-2 over the same period. DCR is concerned that collections net of Dimat sale proceeds would have been dramatically lower, questioning the predictive validity of cash flow modeling done at the onset of the transaction. ... [A]n analysis of the CFS-provided sales data for SMART 96-4 demonstrates a similar reliance upon Dimat sales proceeds. DCR has relied on the eldest outstanding discrete trusts as static pool proxies of the future performance of more recently securitized collateral pools. Given the performance of the earlier pools, and the heavy reliance upon Dimat sale proceeds, DCR has serious concerns about underlying assumptions used in projection of collections.

This language demonstrates that Mayer Brown's failure to disclose to Plaintiffs and other investors CFS's "heavy reliance" on Loan Sales was an omission of material fact.

**Plaintiffs' Reliance**

267.    In connection with the CFS-sponsored securitizations, each of the Plaintiffs (directly or through their investment advisors acting as their agents) and the rating agencies that rated the Notes relied on Mayer Brown's legal opinions that it knew of no misrepresentations or omissions of material fact in the PPMs, due diligence material and other written documents provided to them in connection with their purchases of Notes.  Had Plaintiffs known that Mayer Brown's opinion letters contained untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading, Plaintiffs would not have purchased the Notes.

268.    Each of the Plaintiffs (directly or through their investment advisors acting as their agents) relied on the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.  In turn, each of the rating agencies that rated the CFS Notes relied on Mayer Brown's opinion letters and absent such opinion letters, would not have issued at least an "A" rating or its equivalent on the investment quality of the Notes.  Had the rating agencies known that Mayer Brown's opinion letters contained untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading, they would not have issued at least an "A" rating or its equivalent on the investment quality of the Notes.

269.    Each of the rating agencies and the Plaintiffs and their agents also was unaware of the following facts, among the others alleged above that Mayer Brown knew, or but for its reckless disregard for the truth should have known, but that were not disclosed to them in Mayer

Brown's opinion letters or in the PPMs, due diligence material and other transaction documents

provided to them in connection with the securitizations and Plaintiffs' purchases of Notes:

(a) That as early as September 1996, CFS's collections on SMART 96-2 failed to meet its Base Case requirements and CFS included proceeds from Puts in its "collections" numbers to mislead investors into believing that it was meeting Base Case cash flow requirements for SMART 96-2;

(b) That CFS included the proceeds of the Loan Sales made to Cadle and Dimat in its "collections" numbers for virtually all of its securitizations;

(c) That on several occasions, CFS depended on Loan Sales to make monthly principal and interest payments to investors;

(d) That actual monthly collections for the SMART securitizations were substantially less than the Base Case and Stress Case cash flow requirements for a number of the securitizations;

(e) That CFS's ECR model failed to value the amount of cash that CFS could collect on the Loans and did not comport with CFS's actual historical collections experience;

(f) That CFS regularly closed its Loan Sales on the last day of the month in the amount it needed to make its Base Case and Stress Case requirements for the month and on a cumulative basis;

(g) That CFS sold Loans to an entity affiliated with one of its shareholders and directors who in turn funded the purchases with the proceeds of CFS's securitizations;

(h) That CFS was not the "strong" servicer depicted in Standard & Poor's January 1997 and Duff & Phelps' February 1997 Servicer Evaluations, which continued to be cited in the PPMs and due diligence materials used to sell the Notes and that the facts contained in those reports and upon which they were based were inaccurate;

(i) That Vernick had resigned because, among other things, he discovered that the CFS securitization model was not viable and believed that no improvement in management or productivity would make it viable; and

(j) That CFS's business model had become dependent on Loan Sales.

270.    Had the foregoing facts been disclosed in connection with the SMART and

GREAT securitizations, Plaintiffs would not have purchased the Notes.

271.    To the extent that Plaintiffs had already invested in a SMART transaction, had

they known the truth regarding the matters alleged above, they would have attempted to sell their

Notes, if a buyer existed under those circumstances, or to replace CFS with a back-up servicer when the Loans – the Trusts' only assets – were more valuable and collectible than they were in the fall of 1998 when CFS was forced to cease operations as the truth became known to the rating agencies and investors, or to put the Loans back to CFS under the terms of the transaction documents.

### The AEGON Plaintiffs

272.    Providian Life and Health Insurance Company, through its agent Providian, and AUSA Life Insurance Company, Inc., Life Investors Insurance Company of America and PFL Life Insurance Company, through their agent AEGON, collectively purchased and continued to hold $37 million of SMART 97-2 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

273.    Commonwealth Life Insurance Company and PFL Life Insurance Company, through their agents Providian and AEGON, purchased and continued to hold approximately $10.9 million of SMART 97-4 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

274.    Bankers United Life Assurance Company and Peoples Security Life Insurance Company, through their agent AEGON, collectively purchased and continued to hold $14,000,000 of SMART 97-6 Notes, in reliance upon, among other statements and omissions,

the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

275.    In June 1998, Commonwealth Life Insurance Company and PFL Life Insurance Company, through their agent AEGON, exchanged their SMART 97-4 Notes for GREAT 98-A Notes and continued to hold those Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

### The BlackRock Plaintiffs

276.    BlackRock 2001 Term Trust, Inc., BlackRock Strategic Term Trust, Inc., BlackRock Investment Quality Term Trust, Inc., BlackRock Broad Investment Grade 2009 Term Trust, Inc. and BlackRock Fixed Income Opportunity Fund, through their agent BlackRock, collectively purchased and continued to hold approximately $33,500,000 of SMART 97-2 Notes, approximately $31 million of SMART 97-3 Notes and $16 million of SMART 97-4 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

277.    In June 1998, BlackRock 2001 Term Trust, Inc., BlackRock Strategic Term Trust, Inc., BlackRock Investment Quality Term Trust, Inc., BlackRock Advantage Term Trust, Inc., BlackRock Broad Investment Grade 2009 Term Trust, Inc., and Obsidian Onshore Fund, through

their agent BlackRock, purchased and/or exchanged securities for GREAT 98-A Notes and continued to hold those Notes in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

### The CGA Plaintiffs

278.    On or about November 10, 1997, SG-1, through its agent CGAIM, purchased and continued to hold $6,800,000 of SMART 97-5 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies. At the time of this purchase, CGA directly and indirectly provided insurance to SG-1, guaranteeing that SG-1 would receive payments in the amount of the interest and principal on these Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

279.    On or about December 3, 1997, SG-1, through its agent CGAIM, purchased and continued to hold an additional $2,200,000 of SMART 97-5 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies. At the time of this purchase, CGA directly and

indirectly provided insurance to SG-1, guaranteeing that SG-1 would receive payments in the amount of the interest and principal on these Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

280.    On or about February 10, 1998, SG-1, through its agent CGAIM, purchased and continued to hold an additional $9,600,000 of SMART 97-5 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.  At the time of this purchase, CGA directly and indirectly provided insurance to SG-1, guaranteeing that SG-1 would receive payments in the amount of the interest and principal on these Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

281.    On or about December 10, 1997, SG-1, through its agent CGAIM, purchased and continued to hold $14,000,000 of SMART 97-6 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating

agencies. At the time of this purchase, CGA directly and indirectly provided insurance to SG-1, guaranteeing that SG-1 would receive payments in the amount of the interest and principal on these Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

282.    In or about February 1998, representatives of CGA and Capital Re Management Corp., a wholly owned subsidiary of Plaintiff ACRO, met to discuss a proposed transaction in which ACRO would agree to provide reinsurance to CGA with respect to the insurance that CGA had provided to SG-1 in connection with Notes purchased in the SMART 97-5, SMART 97-6, and SMART 98-1 transactions. The Capital Re Management Corp. and CGA representatives also discussed reinsurance with respect to future CFS securitizations.

283.    On or about February 20, 1998, SG-1, through its agent CGAIM, purchased and continued to hold $25,000,000 of SMART 98-1 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies. At the time of this purchase, CGA directly and indirectly provided insurance to SG-1, guaranteeing that SG-1 would receive payment in the amount of the interest and principal on these Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

284.    As of February 27, 1998, Pacific Life purchased and continued to hold approximately $50,000,000 of SMART 98-1 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.  At the time of the purchase, CGA provided insurance to Pacific Life, guaranteeing that Pacific Life would receive payments in the amount of the interest and principal on these Notes. Pacific Life subsequently exchanged its SMART 98-1 Notes for Notes issued in connection with the GREAT 98-A transaction, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.  On the date of that exchange, CGA provided insurance to Pacific Life, guaranteeing that Pacific Life would receive payments in the amount of the interest and principal on those Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

285.    On or about April 9, 1998, Capital Re Management Corp., acting on behalf of ACRO, advised CGA that ACRO committed to reinsure up to $200 million par amount of SMART 97-5, SMART 97-6, and SMART 98-1 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and

the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies. ACRO subsequently executed agreements in which it agreed to provide reinsurance to CGA in connection with the purchases of Notes by CGAIM on behalf of SG-1 and Pacific Life, as described above.

286.    On or about June 30, 1998, SG-3, through its agent CGAIM, purchased and continued to hold from Chase Securities $58,050,000 of GREAT 98-A Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies. At the time of this purchase, CGA directly and indirectly provided insurance to SG-3, guaranteeing that SG-3 would receive payment in the amount of the interest and principal on these Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

287.    On or about July 2, 1998, SG-1, through its agent CGAIM, exchanged $25,000,000 of SMART 98-1 Notes, with a current face value of $24,396,000, for $24,396,000 in GREAT 98-A Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies. At the time of this purchase, CGA directly and indirectly provided insurance to SG-1, guaranteeing that

SG-1 would receive payment in the amount of the interest and principal on these Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

288.     On or about July 8, 1998, GFCSG, through its agent CGAIM, purchased and continued to hold $28,000,000 of GREAT 98-A Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.  At the time of this purchase, CGA directly and indirectly provided insurance to GFCSG, guaranteeing that GFCSG would receive payment in the amount of the interest and principal on these Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

289.     On or about July 8, 1998, SGH, through its agent CGAIM, purchased and continued to hold $22,057,000 of GREAT 98-A Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.  These Notes were purchased in blocks of $6,083,000 and $15,974,000, respectively. At the time of this purchase, CGA directly and indirectly provided insurance to SGH,

guaranteeing that SGH would receive payment in the amount of the interest and principal on these Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

290.    On or about September 2, 1998, SGH and SG-3, through their agent CGAIM, arranged for a transaction, executed through Chase Securities, in which SG-3 purchased from SGH $22,057,000 of GREAT 98-A Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.  At the time of this purchase, CGA directly and indirectly provided insurance to SG-3, guaranteeing that SG-3 would receive payment in the amount of the interest and principal on these Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

291.    Since the bankruptcy of CFS and CFS-related entities, CGA and ACRO have made payments pursuant to their insurance and reinsurance obligations and are subrogated to the rights of SG-1, SG-3, SGH, Pacific Life, and GFCSG with respect to the purchase and ownership of SMART 97-5, SMART 97-6, SMART 98-1, and GREAT 98-A Notes.

## The H&W Plaintiffs

292.    On or about September 24, 1997, various H&W plaintiffs, through their agent H&W, purchased and continued to hold SMART 97-5 Notes in the amount of approximately $5,700,000 in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies. The H&W Plaintiffs that purchased the SMART 97-5 Securities were Hotchkis and Wiley Low Duration Fund, Hotchkis and Wiley Total Return Bond Fund, Hotchkis and Wiley Short-Term Investment Fund, Foodmaker Master Retirement Fund, Triangle Distributing Company Profit Sharing Plan Trust and AMR Investment Services Balanced Portfolio.

293.    On or about February 24, 1998, various H&W plaintiffs, through their agent H&W, purchased and continued to hold SMART 98-1 Notes in the amount of approximately $4,400,000 in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies. In or about July 1998, H&W exchanged its SMART 98-1 Notes for GREAT 98-A Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies. The H&W Plaintiffs that purchased SMART 98-1 Securities and exchanged them for GREAT 98-A Securities were Hotchkis and Wiley Low

Duration Fund, Hotchkis and Wiley Total Return Bond Fund and Hotchkis and Wiley Balanced Fund.

### The Hyperion Plaintiffs

294.    On or about March 3, 1997, various Hyperion plaintiffs, through their agent HCM, purchased and continued to hold $9 million of SMART 97-2 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies. Specifically, HTR, through its agent HCM, purchased and continued to hold $3 million; KCERA, through its agent HCM, purchased and continued to hold $2 million; and Enhance, through its agent HCM, purchased and continued to hold $4 million.

295.    On or about July 30, 1997, various Hyperion plaintiffs, through their agent HCM, purchased and continued to hold $18 million of SMART 97-4 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies. Specifically, ATRS, through its agent HCM, purchased and continued to hold $8 million; HTR, through its agent HCM, purchased and continued to hold $2 million; Southwestern Life, through its agent HCM, purchased and continued to hold $2 million; Security Life, through its agent HCM, purchased and continued to hold $2 million; KCERA, through its agent HCM, purchased and continued to hold $2 million; and EURIBOR, through its agent HCM, purchased and continued to hold $2 million.

296.    On or about September 24, 1997, various Hyperion plaintiffs, through their agent HCM, purchased and continued to hold $19 million of SMART 97-5 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's , the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.  Specifically, Southwestern Life, through its agent HCM, purchased and continued to hold $4 million; EURIBOR, through its agent HCM, purchased and continued to hold $2 million; ATRS, through its agent HCM, purchased and continued to hold $11 million; and KCERA, through its agent HCM, purchased and continued to hold $2 million.  On or about September 24, 1997, Keyport, through its agent HCM, purchased and continued to hold $4 million of SMART 97-5 Notes in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

297.    On or about December 5, 1997, various Hyperion plaintiffs, through their agent HCM, purchased and continued to hold $18 million of SMART 97-6 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.  Specifically, EURIBOR, through its agent HCM, purchased and continued to hold $2 million; Enhance, through its agent HCM, purchased and continued to hold $3 million; and OBWC, through its agent HCM, purchased and continued to hold $13 million.  On or about December 5, 1997, Keyport, through its agent HCM, purchased

and continued to hold $3 million of SMART 97-6 Notes in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

298.    On or about July 2, 1998, various Hyperion plaintiffs, through their agent HCM, exchanged $16 million of SMART 97-4 Notes for GREAT 98-A Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

### The ING Plaintiffs

299.    On or about June 19, 1996, Life Insurance Company of Georgia, Southland Life Insurance Company, Indiana Insurance Company, Security Life of Denver Insurance Company and Peerless Insurance Company purchased and continued to hold a total of approximately $22.5 million of SMART 96-2 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

300.    On or about December 23, 1996, Columbine Life Insurance Company and Midwestern United Life Insurance Company, purchased and continued to hold a collective total of approximately $15 million of SMART 96-4 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer

Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

301.    On or about March 6, 1997, Columbine Life Insurance Company, through its agent ING, purchased and continued to hold a total of approximately $11,000,000 of SMART 97-2 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

302.    On or about December 10, 1997, Columbine Life Insurance Company and Golden American Life Insurance Company, through their agent ING, purchased and continued to hold a collective total of approximately $28 million of SMART 97-6 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

303.    In February 1998, Columbine Insurance Company, USG Annuity & Life Company, Security Life of Denver Insurance Company, Golden American Insurance Company and Life Insurance Company of Georgia purchased and continued to hold a collective total of approximately $21.2 million of SMART 98-1 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and

the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

304.    In June 1998, Columbine Insurance Company, USG Annuity & Life Company, Security Life of Denver Insurance Company, Golden American Insurance Company and Life Insurance Company of Georgia exchanged SMART 98-1 Notes for SMART 98-A Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

### The Liberty Companies

305.    On December 10, 1997, the Liberty Companies made the following purchases of SMART 97-6 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies:

| Company | Face Amount Purchased |
| --- | --- |
| Liberty Mutual | $10 million |
| Liberty Fire | $4 million |
| Liberty Life | $5 Million |
| Golden | $1 million |

### The ML Plaintiffs

306.    On or about September 29, 1997, the ML Plaintiffs, acting through their discretionary investment advisor, MLAM, purchased and continued to hold SMART 97-5 Notes

in the amount of $4,700,000 in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

307.    On or about December 10, 1997, the ML Plaintiffs, acting through their discretionary investment advisor, MLAM, purchased and continued to hold SMART 97-6 Notes in the amount of $5,000,000 in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

308.    On or about February 27, 1998, the ML Plaintiffs, acting through their discretionary investment advisor, MLAM, purchased and continued to hold SMART 98-1 Notes in the amount of $5,000,000 in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.  In June 1998, the ML Plaintiffs, acting through their discretionary investment advisor, MLAM, exchanged their SMART 98-1 Notes for Notes issued by the GREAT 98-A in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

**Stein Roe Plaintiffs**

309.    On or about March 6, 1997, Keyport, through its agent Stein Roe, purchased and continued to hold SMART 97-2 Notes in the amount of $20,000,000 in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.  On or about April 10, 1997, Keyport, through its agent Stein Roe, purchased and continued to hold SMART 97-3 Notes in the amount of $13,000,000 in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.  On or about August 6, 1997, Chrysler Insurance Company, through its agent Stein Roe, purchased and continued to hold SMART 97-4 Notes in the amount of $1,000,000 in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

310.    In or about June 1998, Chrysler Insurance Company, through its agent Stein Roe, exchanged its SMART 97-4 Notes for GREAT 98-A Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other

transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

### Keyport

311.    In addition to purchases of SMART Notes made on its behalf by HCM and Stein Roe, in February 1998, Keyport, through its investment advisor and agent Miller Anderson & Sherrerd (**"Miller Anderson"**), purchased and continued to hold $3,975,000 of SMART 98-1 Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.  In June 1998, Keyport, through its investment advisor, Miller Anderson, exchanged its SMART 1998-1 Notes for GREAT 98-A Notes transaction in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

### Western Asset Plaintiffs

312.    On or about June 30, 1998, the entities listed below, through their agent Western Asset, purchased and continued to hold approximately $14,000,000,000 of GREAT 98-A Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies as follows:

| Purchaser | Face Amount of Notes |
|---|---|
| Western Asset Limited Duration Portfolio | $    560,000 |
| Curtis Bay Insurance Co., Ltd. | 120,000 |
| St. George Corporation | 1,340,000 |
| AF Portfolio Limited | 6,160,000 |
| Bayer Corporation Master Trust | 1,400,000 |
| Unisys Master Trust | 3,100,000 |
| R.J. Reynolds Company Defined Benefit Master Trust | 402,000 |
| Nabisco Inc. Defined Benefit Trust | 268,000 |

313.    On April 5, 1999, Western Asset purchased the holdings of Western Asset Limited Duration Portfolio and fully succeeded to the rights of Western Asset Limited Duration Portfolio with respect to its investment in GREAT 1998-A.

**AmerUs**

314.    AmerUs Life Insurance Company purchased and continued to hold $3,000,000 of SMART 97-2 Notes and $1,100,000 of SMART 97-4 Notes when these Notes were first issued in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

315.    In June, 1998, AmerUs exchanged its SMART 97-4 Notes for GREAT 98-A Notes, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

**The Miller Anderson and Morgan Stanley Plaintiffs**

316.    Miller, Anderson & Sherrerd, LLP ("Miller Anderson") and Morgan Stanley Dean Witter Investment Management, Inc. ("Morgan Stanley") respectively, acted as investment

advisors to and agents for the Miller Anderson and Morgan Stanley Plaintiffs, with the authority to purchase securities on their behalf.

317.    On or about September 24, 1997, plaintiffs Forethought Life Insurance Company, Manufacturers Investment Trust, MAS Funds - Multi Asset Class Portfolio, MAS Funds - Fixed Income Portfolio, MAS Funds - High Yield Portfolio, MAS Funds – Multi-Market Fixed Income Portfolio, MAS Offshore Leveraged Fixed Income Fund, Morgan Stanley Dean Witter Global Opportunity Bond Fund, MSDW SICAV U.S. High Yield Bond Fund, Sun American Series Trust, Trustees of the University of Pennsylvania - High Yield, Van Kampen High Yield and Total Return Fund, Van Kampen Worldwide High Income Fund, through their investment advisor and agent Miller Anderson and/or Morgan Stanley, purchased and continued to hold approximately $16 million in SMART 97-5 Notes.  Plaintiffs, through their agent Miller Anderson and/or Morgan Stanley, purchased these Notes in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

318.    On or about December 5, 1997, plaintiffs AAA Investment Co., American Automobile Association, Inc., Abington Memorial, AGFA Corporation Pension Plan Master Trust, American Cast Iron Pipe Company Pension Trust, American Museum of Natural History, American Red Cross Endowment Fund, Armco Master Pension Trust, Bayer Corporation Master Trust, Bell Atlantic Master Trust, Berea College, Brandeis University, Carnegie Corporation of New York, Carnegie Institute of Washington, Carnegie Mellon University, Children's Hospital Foundation, Chubb & Son Inc. Master Trust, Cleveland Museum of Art, Cluett American

Retirement Plan, The Duke Endowment, Elf Atochem North America, Inc., Educational

Employees Supplementary Retirement System of Fairfax County, First Energy System Master

Retirement Trust, Ford Foundation, Ford Motor Company Master Trust, France-Merrick

Foundation, Haas, Evelyn & Walter, Fund, Howard Heinz Endowment, Vira I. Heinz

Endowment, Hershey Principal Trust, Trustee for Milton Hershey School, Hershey Income

Trust, Trustee for Milton Hershey School, Conrad N. Hilton Foundation, Harvey Hubell,

Incorporated, Master Pension Trust, Marsh & McLennan U.S. Retirement Plan, Joint Industry

Board/ Electric Inc., W. Alton Jones Foundation, Inc., John D. and Catherine T. MacArthur

Foundation, Josiah Macy, Jr. Foundation, Mary Flagler Cary Charitable Trust, MAS Funds -

Balanced Portfolio, MAS Funds - Special Purpose Fixed Income Portfolio, MAS Funds – Multi-

Market Fixed Income Portfolio, Minnesota State Board of Investment , The Northern Trust

Company as Trustee for the Monsanto Company Master Trust, Mount Holyoke College,

Municipal Fire & Police Ret. of Iowa, National Electric Contractors Assn. Pension Trust, New

Church Investment Fund, New York City Firefighters Variable Supplement Fund, Philharmonic

Symphony Society of New York, Northwest Community Healthcare, Northwestern Memorial

Corporation, Olin Corporation, Commonwealth of Pennsylvania State Employees' Retirement

System, Pacific Gas & Electric Corporation, PECO Energy Company, The Peddie School,

Premark International, Inc., Principia Corporation Pension Trust, Public School Teachers'

Pension & Retirement Fund of Chicago, Rensaeleer Polytechnic Institute, Republic Funds,

Pension Plan for the Employees of Joseph E. Seagram and Sons, Inc., SKF USA Inc.,

Administrator of SKF USA Inc Master Trust, The Northern Trust Company as Trustee for the

Solutia Master Pension Trust, Sunoco, Inc Master Retirement Trust, SYNTEX U.S. Employees

Pension Trust, Syracuse University, TI Employees Pension Trust, Trustees of the University of

Pennsylvania, Washington & Lee University, Wellesley College, Western Metal Industry

Pension, Western PA Teamsters and Teamsters and Employers Pension Fund, X.L. Capital,

Yeshiva University, and York International Corporation, through their agent Miller Anderson

and/or Morgan Stanley, purchased and continued to hold approximately $30 million in SMART

97-6 Notes.  Plaintiffs, through their agent Miller Anderson and/or Morgan Stanley, purchased

these Notes in reliance upon, among other statements and omissions, the accuracy of material

representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due

diligence materials and other transaction documents, and the "A" rating or its equivalent on the

investment quality of the Notes provided by CFS's rating agencies.

319.    In February 1998, plaintiffs AAA Investment Co., American Automobile

Association, Inc., AGFA Corporation Pension Plan Master Trust, American Cast Iron Pipe

Company Pension Trust, American Museum of Natural History, American National Can

Retirement Trust, American Nuclear Insurers, American Red Cross Endowment Fund, Bayer

Corporation Master Trust, Bell Atlantic Master Trust, State Street Bank & Trust Company, as

Trustee of the Black & Decker Defined Benefit Plan Master Trust, Carnegie Institute of

Washington, Carnegie Mellon University, Chubb & Son Inc. Master Trust, Cleveland Museum

of Art, Columbia University (CIM XII, L.L.C.), Copic, Direct Response Corporation, The Duke

Endowment, Elf Atochem North America, Inc., Enterprise Reinsurance Holdings, Educational

Employees Supplementary Retirement System of Fairfax County, Fieldcrest Canon, First Energy

System Master Retirement Trust, France-Merrick Foundation, Gerling Global Reinsurance

Company of America, Haas, Evelyn & Walter, Fund, Hershey Principal Trust, Trustee for Milton

Hershey School, Hershey Income Trust, Trustee for Milton Hershey School, Conrad N. Hilton

Foundation, Harvey Hubell, Incorporated, Master Pension Trust, Marsh & McLennan U.S.

Retirement Plan, Joint Industry Board/ Electric Inc., John D. and Catherine T. MacArthur

Foundation, Mannesmann Corporation Master Trust, MAS Funds - Balanced Portfolio, MAS

Funds - Fixed Income Portfolio, MAS Funds - Intermediate Duration Portfolio, MAS Funds -

Limited Duration Portfolio, Minnesota State Board of Investment, The Northern Trust Company

as Trustee for the Monsanto Company Master Trust, Municipal Fire & Police Ret. of Iowa,

National Electric Contractors Assn. Pension Trust, New Church Investment Fund, New York

City Firefighters Variable Supplement Fund, Philharmonic Symphony Society of New York,

Northwest Community Healthcare, Northwestern Memorial Corporation, Olin Corporation,

Commonwealth of Pennsylvania State Employees' Retirement System, Pacific Gas & Electric

Corporation, PCFG Long Term Investment Co., PECO Energy Company, The Peddie School,

Premark International, Inc., Principia Corporation Pension Trust, Public School Teachers'

Pension & Retirement Fund of Chicago, Republic Funds, Pension Plan for the Employees of

Joseph E. Seagram and Sons, Inc., The Northern Trust Company as Trustee for the Solutia

Master Pension Trust, Sunoco, Inc. Master Trust for Defined Contribution Plans, SYNTEX U.S.

Employees Pension Trust, Syracuse University, Trustees of the University of Pennsylvania,

W.K. Kellogg Foundation Trust, Western PA Teamsters and Teamsters and Employers Pension

Fund, Yeshiva University, York International Corporation, through their agent Miller Anderson

and/or Morgan Stanley, purchased and continued to hold approximately $40 million in SMART

98-1 Notes.  Plaintiffs, through their agent Miller Anderson and/or Morgan Stanley, purchased

and continued to hold these Notes in reliance upon, among other statements and omissions, the

accuracy of material representations and lack of material omissions in Mayer Brown's opinion

letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or

its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

320.    In June 1998, the Miller Anderson and Morgan Stanley Plaintiffs who purchased SMART 98-1 Notes, through their agent Miller Anderson and/or Morgan Stanley, exchanged the SMART 98-1 Notes for GREAT 98-A Notes of like face amount, in reliance upon, among other statements and omissions, the accuracy of material representations and lack of material omissions in Mayer Brown's opinion letters, the PPMs, due diligence materials and other transaction documents, and the "A" rating or its equivalent on the investment quality of the Notes provided by CFS's rating agencies.

## COUNT I

### Violation of Section 10(b) of the 1934 Act and SEC Rule 10b-5

321.    Plaintiffs reallege and incorporate each of the allegations set forth in the preceding paragraphs.

322.    The Notes purchased by Plaintiffs in the CFS-sponsored securitizations are "securities" as that term is defined in Section 3(a)(10) of the Exchange Act.

323.    To induce Plaintiffs to purchase the CFS Securities beginning at least with SMART 97-4, Mayer Brown, in contravention of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, through the use of the means or instrumentalities of interstate commerce, engaged in a scheme or common course of conduct, including making untrue statements of material fact and omitting to state material facts necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

324.    Mayer Brown acted with scienter in that, with knowledge or reckless disregard for facts that would have given rise to knowledge, it made the untrue statements of material fact to Plaintiffs and the rating agencies in its Rule 10b-5 letters sent to Plaintiffs in connection with the CFS-sponsored securitizations, beginning at least with SMART 97-4, as set forth below:

[W]e advise you that no facts have come to our attention which lead us to believe that as of its date, the Memorandum [PPM] ... contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

325.    Mayer Brown acted with scienter in that, with knowledge or reckless disregard for facts that would have given rise to knowledge, its Rule 10b-5 opinion letters sent to Plaintiffs in connection with the CFS-sponsored securitizations beginning at least with SMART 97-4 omitted to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

326.    Mayer Brown acted with scienter in that, with knowledge or reckless disregard for facts that would have given rise to knowledge, it made the untrue statement of material fact to Plaintiffs and the rating agencies in its Nonconsolidation opinion letters sent to Plaintiffs and the rating agencies in connection with the CFS-sponsored securitizations beginning with at least with SMART 97-4, that it relied and assumed that "there has been no (and there will not be any) fraud in connection with any of the Transactions [emphasis added]," and that this reliance was reasonable.

327.    Mayer Brown acted with scienter in that, with knowledge or reckless disregard for facts that would have given rise to knowledge, its Nonconsolidation opinion letters sent to Plaintiffs and the rating agencies in connection with the CFS-sponsored securitizations beginning at least with SMART 97-4, omitted to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

328.    Mayer Brown acted with scienter in that, with knowledge or reckless disregard for facts that would have given rise to knowledge, it made the untrue statements of material facts to Plaintiffs and the rating agencies in its Tax opinion letters sent to Plaintiffs and the rating

agencies in connection with the CFS-sponsored securitizations beginning at least with SMART 97-4, that it had relied upon the accuracy of transaction documents referenced in its Tax opinion letters and that this reliance was reasonable.

329.    Mayer Brown acted with scienter in that, with knowledge or reckless disregard for facts that would have given rise to knowledge, its Tax opinion letters sent to Plaintiffs and the rating agencies in connection with the CFS-sponsored securitizations beginning at least with SMART 97-4, omitted to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

330.    Mayer Brown acted with scienter in that, with knowledge or reckless disregard for facts that would have given rise to knowledge, it made the untrue statement of material fact to Plaintiffs and the rating agencies in its Investment Company Act letters sent to Plaintiffs and the rating agencies in connection with the CFS-sponsored securitizations beginning at least with SMART 97-4, that it had relied on the fact that "there has not been any fraud, duress, undue influence or material mistake of fact in connection with the Transactions," and that this reliance was reasonable.

331.    Mayer Brown acted with scienter in that, with knowledge or reckless disregard for facts that would have given rise to knowledge, its Investment Company Act letters sent to Plaintiffs and the rating agencies in connection with the CFS-sponsored securitizations beginning at least with SMART 97-4 omitted to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

332.    Mayer Brown's opinion letters beginning at least with SMART 97-4, were false and misleading at the time they were issued because, in fact, Mayer Brown, through its work as

CFS's primary counsel, knew, or recklessly disregarded facts that would have given rise to knowledge, including, but not limited to, the following:

(a) That as early as September 1996, CFS's collections on SMART 96-2 failed to meet its Base Case requirements and CFS included proceeds from Puts in its "collections" numbers to mislead investors into believing that it was meeting Base Case cash flow requirements;

(b) That CFS included the proceeds of the Loan Sales made to Cadle and Dimat in its "collections" numbers in virtually all of its securitizations;

(c) That on several occasions, CFS depended on Loan Sales to make monthly principal and interest payments to investors;

(d) That actual monthly collections for the SMART securitizations were substantially less than the Base Case and Stress Case cash flow requirements for a number of the securitizations;

(e) That CFS's ECR model failed to value the amount of cash that CFS could collect on the Loans and did not comport with CFS's actual historical collections experience;

(f) That CFS regularly closed its Loan Sales on the last day of the month in the amount it needed to make its Base Case and Stress Case requirements for the month and on a cumulative basis;

(g) That CFS sold Loans to an entity affiliated with one of its shareholders and directors who in turn funded the purchases with the proceeds of CFS's securitizations;

(h) That CFS was not the "strong" servicer depicted in Standard & Poor's January 1997 and Duff & Phelps' February 1997 Servicer Evaluations, which continued to be cited in the PPMs and due diligence materials used to sell the Notes and that the facts contained in those reports and upon which they were based were inaccurate;

(i) That Vernick had resigned because, among other things, he discovered that the CFS securitization model was not viable and believed that no improvement in management or productivity would make it viable; and

(j) That CFS's business model had become dependent on Loan Sales.

333.    Each of these statements and omissions, as well as the other false representations and misleading omissions alleged in this Complaint, were material to the rating agencies which provided at least an "A" rating or its equivalent on the investment quality of the Notes. Each of these statements and omissions, as well as the other false representations and misleading

omissions alleged in this Complaint, were material to Plaintiffs' decisions to purchase their SMART and GREAT notes.

334.    Each of the rating agencies that rated CFS-sponsored Notes relied on Mayer Brown's opinion letters and without such opinion letters, would not have issued at least an "A" rating or its equivalent on the investment quality of the Notes.  Had the rating agencies known that Mayer Brown's opinion letters contained untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading, they would not have issued at least an "A" rating or its equivalent on the investment quality of the Notes.

335.    Mayer Brown violated Section 10(b) of the 1934 Act and SEC Rule 10b-5 in that it:

(i)    employed devices, schemes and artifices to defraud Plaintiffs;

(ii)    made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading; and

(iii)    engaged in acts, practices and a course of business that operated a fraud and deceit upon Plaintiffs in connection with Plaintiffs' purchases of the SMART and GREAT Notes.

336.    Mayer Brown's scheme, including the misstatements and omissions related to the SMART and GREAT offerings, beginning at least with SMART 97-4, and including but not limited to those contained in its opinion letters, the PPMs, due diligence materials, and transaction documents prepared in connection with the sale of Notes in these offerings, caused the price Plaintiffs paid for the SMART and GREAT Notes to be vastly inflated.  Further, these

misstatements and omissions concern the very reasons Plaintiffs bought the SMART and GREAT Notes at an inflated value, namely CFS's supposed "superior" collection ability, its supposedly consistent historical results, and its purportedly reasonable ECR and cash flow models.

337.    Plaintiffs, at the time of the representations and omissions, did not know of Mayer Brown's false statements and misleading omissions. In reliance upon the misrepresentations and omissions, and unaware of the truth, Plaintiffs were induced to and did purchase the Notes in the SMART and GREAT offerings. Had they known the truth, Plaintiffs would not have bought Notes in these offerings.

338.    As a direct result of Mayer Brown's misstatements and omissions, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT II

### Violations of Section 408(b) of the Oklahoma Securities Act

339.    Plaintiffs reallege and reincorporate the allegations in paragraphs 1 through 320 above as if fully set forth herein.

340.    The Securities purchased by Plaintiffs in the CFS-sponsored securitizations are "securities" as that term is defined in the Oklahoma Securities Act.

341.    CFS offered and/or sold Securities to Plaintiffs by means of untrue statements of material fact and omissions of material fact necessary to make the statements, in light of the circumstances in which they were made, not misleading. In the alternative, CFS actively and directly participated in the solicitation of the sale of Securities to Plaintiffs by means of untrue statements of material fact and/or omissions of material fact necessary to make the statements, in light of the circumstances in which they were made, not misleading.

342.    As set forth above, CFS violated Section 408(a) of the Oklahoma Securities Act. But for the automatic stay under 11 U.S.C. § 362, CFS would be liable for violating Section 408(a) of the Oklahoma Securities Act.

343.    Mayer Brown is liable under Section 408(b) of the Oklahoma Securities Act because it aided and materially participated in the sales of Notes to Plaintiffs by, among other things, providing opinion letters to Plaintiffs and the rating agencies in connection with the SMART and GREAT securitizations, and preparing PPMs, due diligence materials and other transaction documents in connection with the SMART and GREAT securitizations.

344.    These materials were false and misleading in that, among other things, they failed to disclose the following:

(a) That as early as September 1996, CFS's collections on SMART 96-2 failed to meet its Base Case requirements and CFS included proceeds from Puts in its "collections" numbers to mislead investors into believing that it was meeting Base Case cash flow requirements for SMART 96-2;

(b) That CFS included the proceeds of the Loan Sales made to Cadle and Dimat in its "collections" numbers for virtually all of its securitizations;

(c) That on several occasions, CFS depended on Loan Sales to make monthly principal and interest payments to investors;

(d) That actual monthly collections for the SMART securitizations were substantially less than the Base Case and Stress Case cash flow requirements for a number of the securitizations;

(e) That CFS's ECR model failed to value the amount of cash that CFS could collect on the Loans and did not comport with CFS's actual historical collections experience;

(f) That CFS regularly closed its Loan Sales on the last day of the month in the amount it needed to make its Base Case and Stress Case requirements for the month and on a cumulative basis;

(g) That CFS sold Loans to an entity affiliated with one of its shareholders and directors who in turn funded the purchases with the proceeds of CFS's securitizations;

(h) That CFS was not the "strong" servicer depicted in Standard & Poor's January 1997 and Duff & Phelps' February 1997 Servicer Evaluations, which continued to be cited

in the PPMs and due diligence materials used to sell the Notes and that the facts contained in those reports and upon which they were based were inaccurate;

(i) That Vernick had resigned because, among other things, he discovered that the CFS securitization model was not viable and believed that no improvement in management or productivity would make it viable; and

(j) That CFS's business model had become dependent on Loan Sales.

345.    Plaintiffs justifiably relied upon Mayer Brown's misrepresentations and/or omissions of material fact to their detriment. Had Plaintiffs known the true facts, they would have: (1) not purchased the Securities; (2) not continued to hold the Securities they had previously purchased; and (3) taken steps to protect the collateral underlying their SMART and GREAT Securities, including without limitation replacing CFS with a back-up servicer or putting the Loans back to CFS in accordance with the terms of the transaction documents.

346.    Mayer Brown's conduct in violation of Section 408(b) caused Plaintiffs damages in an amount to be determined at trial.

## COUNT III

### Common Law Fraud

347.    Plaintiffs reallege and reincorporate the allegations in paragraphs 1 through 320.

348.    Mayer Brown made material misrepresentations and/or omissions of material fact as detailed in this Complaint, including misstatements and omissions regarding CFS's historical performance, the competence of its collection systems and procedures, and the reasonableness of its cash flow models.

349.    With regard to each misstatement and omission set forth in this Complaint, Mayer Brown had a duty to fully and truthfully disclose all material information when it participated in the solicitation of Plaintiffs' purchases in the SMART and GREAT offerings.

350.    Mayer Brown made these misrepresentations and/or omissions of material fact with knowledge of their falsity, or in reckless disregard of the truth of their representations or omissions.

351.    Mayer Brown engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs.

352.    Mayer Brown made these misrepresentations and omissions of material fact with the intent that Plaintiffs would rely on them in making their decisions regarding whether to purchase, sell or continue to hold the SMART and GREAT Securities, or take other actions to protect their collateral. Further, Mayer Brown made the omissions of material fact detailed above with the intent that Plaintiffs would rely on the incomplete and false information that they had been provided in making their decisions regarding whether to purchase or sell the SMART and GREAT Securities or take other actions to protect their investments.

353.    Plaintiffs justifiably relied upon Mayer Brown's misrepresentations and/or omissions of material fact to their detriment. Had Plaintiffs known the true facts, they would have: (1) not purchased the Securities; (2) not continued to hold the Securities they had previously purchased; and (3) taken steps to protect the collateral underlying their SMART and GREAT Securities, including without limitation replacing CFS with a back-up servicer or putting the Loans back to CFS in accordance with the terms of the transaction documents.

354.    Mayer Brown's misrepresentations and/or omissions of material fact proximately caused Plaintiffs to suffer damages in an amount to be determined at trial, as a result of their purchases of Notes in the SMART and GREAT offerings.

## COUNT IV

### Negligent Misrepresentation

355.    Plaintiffs reallege and reincorporate the allegations in Paragraphs 1 through 320.

356.    Mayer Brown supplied information for the guidance of Plaintiffs and other investors in deciding whether to invest in the SMART and GREAT securitizations.  In particular, among other things as more fully set forth above, Mayer Brown provided numerous opinion letters addressed to Plaintiffs, providing legal advice to Plaintiffs in connection with Plaintiffs' decision to purchase the Notes.

357.    Mayer Brown knew that the rating agencies would rely on its opinion letters in rating the Notes in the SMART and GREAT securitizations and Mayer Brown knew that Plaintiffs would rely on its opinion letters in deciding whether to purchase, sell or continue to hold the SMART and GREAT Notes.

358.    Mayer Brown had access to inside information about CFS that was not made available to the public, the rating agencies or Plaintiffs in the SMART and GREAT securitizations.

359.    In connection with the sale of Notes in the SMART and GREAT offerings, Mayer Brown owed Plaintiffs a duty of care to make reasonable inquiry of CFS and to make accurate and full disclosure regarding the matters set forth in this Complaint, including the nature of CFS's business model, the historical performance of CFS's business model, collection systems and abilities and the reasonableness of its cash flow models.  With regard to each omission set forth in this Complaint, Mayer Brown had a duty to make reasonable inquiry of CFS and to make accurate and full disclosure of the information withheld.

360.    Mayer Brown breached its duty of care and negligently made material misrepresentations to Plaintiffs as detailed in this Complaint, including but not limited to, representations concerning CFS's historical performance, the validity of CFS's collection models, and the purported strengths of its systems, operations, strengths and procedures as fully set forth herein. Instead of fully reporting these structural problems to Plaintiffs and other investors, Mayer Brown negligently continued to represent, among the other matters set forth in this Complaint, CFS as a superior debt collector that was meeting its Base Case and Stress Case cash flow requirements, and CFS's ECR model as a reasonable means of valuing the cash CFS was to collect on the Loans. Mayer Brown did this by, among other things more fully set forth in this Complaint, preparing the false and misleading opinion letters, PPMs, and other transaction documents.

361.    Mayer Brown, in issuing its opinion letters and preparing the PPMs and other transaction-related documents made these misrepresentations of material fact with the intent that Plaintiffs rely on them in making their decisions regarding whether to purchase, sell, or continue to hold the Securities issued in the SMART and GREAT securitizations.

362.    Plaintiffs justifiably relied upon Mayer Brown's negligent misrepresentations of material fact to their detriment. Had Plaintiffs known the true facts, they would have: (1) not purchased the Securities; (2) not continued to hold the Securities they had previously purchased; and (3) taken steps to protect the collateral underlying their SMART and GREAT Securities, including without limitation CFS with a back-up servicer or putting the Loans back to CFS in accordance with the terms of the transaction documents.

363.    Mayer Brown's negligent misrepresentations and/or omissions of material fact proximately caused Plaintiffs to be injured in an amount to be determined at trial.

364.    Mayer Brown's misrepresentations and/or omissions of material fact proximately caused Plaintiffs to suffer damages, in an amount to be determined at trial, as a result of their purchases of Notes in the SMART and GREAT offerings.

## COUNT V

### Professional Negligence

365.    Plaintiffs reallege and reincorporate the allegations in Paragraphs 1 through 320.

366.    As set forth in detail in this Complaint, in directly providing legal advice to Plaintiffs, with the knowledge that they would rely on such legal advice, Mayer Brown owed a duty of care to Plaintiffs.

367.    Mayer Brown breached this duty of care by negligently failing to make reasonable inquiry of CFS and to make accurate and full disclosure regarding the matters set forth in this Complaint, including the nature of CFS's business model, the historical performance of CFS's business model, collection systems and abilities and the reasonableness of its cash flow models. With regard to each omission set forth in this Complaint, Mayer Brown had a duty to make reasonable inquiry of CFS and to make accurate and full disclosure of the information withheld.

368.    Mayer Brown also breached its duty of care by unreasonably and negligently stating in its opinion letters that it had no reason to believe and did not believe that any representations and/or omissions in the PPMs and other transaction documents were materially false or misleading. Mayer Brown also breached its duty of case by unreasonably and negligently relying upon or assuming the truth of information contained in documents referenced in its opinion letters.

369.    Mayer Brown negligently made material misrepresentations and/or omissions of material fact to Plaintiffs as detailed in this Complaint, including but not limited to,

representations and omissions concerning CFS's historical performance, the validity of CFS's

collection models, and the purported strengths of its systems, operations, strengths and

procedures. Instead of fully reporting these structural problems to Plaintiffs and other investors,

Mayer Brown negligently continued to represent, among other things set forth in this Complaint,

CFS as a superior debt collector and CFS's ECR model as a reasonable means of valuing the

cash that CFS was to collect on the Loans. Mayer Brown did this by, among other things more

fully set forth in this Complaint, preparing the false and misleading opinion letters, PPMs and

other transaction documents.

370.    Plaintiffs justifiably relied upon Mayer Brown's misrepresentations and/or

omissions of material fact to their detriment. Had Plaintiffs known the true facts, they would

have: (1) not purchased the Securities; (2) not continued to hold the Securities they had

previously purchased; and (3) taken steps to protect the collateral underlying their SMART and

GREAT Securities, including without limitation replacing CFS with a back-up servicer or

putting the Loans back to CFS in accordance with the terms of the transaction documents.

371.    Mayer Brown's professional negligence proximately caused Plaintiffs damages in

an amount to be determined at trial.

**COUNT VI**

**Violations of Section 105-12 of the Georgia Securities Act of 1973
(on behalf of the ING Plaintiffs)**

372.    Plaintiffs reallege and reincorporate the allegations in paragraphs 1 through 320.

373.    As previously alleged, CFS, through the Trusts and its agents, made offers to sell

Securities to the ING Plaintiffs.

374.    CFS's offers to sell were directed at the ING Plaintiffs in Georgia and the ING

Plaintiffs received solicitations to purchase Securities in Georgia.

375.    Mayer Brown violated Section 10-5-12 of the Georgia Securities Act of 1973 because Mayer Brown made untrue statements of material fact and omissions of material fact in connection with the offer to sell Securities to the ING Plaintiffs.

376.    Mayer Brown violated Section 10-5-12 of the Georgia Securities Act by, among other things, providing opinion letters to the Plaintiffs and rating agencies, and preparing PPMs and due diligence materials and other transaction documents in connection with the SMART and GREAT offerings that it knew or should have known contained material misstatements and omissions.

377.    These materials were false and misleading in that, among other things, they failed to disclose the following:

(a)   That as early as September 1996, CFS's collections on SMART 96-2 failed to meet its Base Case requirements and CFS included proceeds from Puts in its "collections" numbers to mislead investors into believing that it was meeting Base Case cash flow requirements for SMART 96-2;

(b)   That CFS included the proceeds of the Loan Sales made to Cadle and Dimat in its "collections" numbers for virtually all of its securitizations;

(c)   That on several occasions, CFS depended on Loan Sales to make monthly principal and interest payments to investors;

(d)   That actual monthly collections for the SMART securitizations were substantially less than the Base Case and Stress Case cash flow requirements for a number of the securitizations;

(e)   That CFS's ECR model failed to value the amount of cash that CFS could collect on the Loans and did not comport with CFS's actual historical collections experience;

(f)   That CFS regularly closed its Loan Sales on the last day of the month in the amount it needed to make its Base Case and Stress Case requirements for the month and on a cumulative basis;

(g)   That CFS sold Loans to an entity affiliated with one of its shareholders and directors who in turn funded the purchases with the proceeds of CFS's securitizations;

(h)   That CFS was not the "strong" servicer depicted in Standard & Poor's January 1997 and Duff & Phelps' February 1997 Servicer Evaluations, which continued to be cited

in the PPMs and due diligence materials used to sell the Notes and that the facts
contained in those reports and upon which they were based were inaccurate;

(i)   That Vernick had resigned because, among other things, he discovered that the CFS
securitization model was not viable and believed that no improvement in management
or productivity would make it viable; and

(j)   That CFS's business model had become dependent on Loan Sales.

378.   The ING Plaintiffs justifiably relied upon Mayer Brown's misrepresentations
and/or omissions of material fact to their detriment. Had the ING Plaintiffs known the true facts,
they would have: (1) not purchased the Securities; (2) not continued to hold the Securities they
had previously purchased; and (3) taken steps to protect the collateral underlying their SMART
and GREAT Securities, including without limitation replacing CFS with a back-up servicer or
putting the Loans back to CFS in accordance with the terms of the transaction documents.

379.   As a direct result of Mayer Brown's misrepresentations and omissions, the ING
Plaintiffs suffered damages in an amount to be established at trial.

380.   Mayer Brown is liable for the damages suffered by the ING Plaintiffs in an
amount to be determined at trial, pursuant to Section 10-5-14 of the Georgia Securities Act of
1973.

## COUNT VII

### Violations of Section 502.401 and 502.503 of the Iowa Uniform Securities Act
### (on behalf of the AEGON Plaintiffs and AmerUs)

381.   Plaintiffs reallege and reincorporate the allegations in paragraphs 1 through 320.

382.   As previously alleged, CFS, through the Trusts and its agents, made offers to sell
the Securities to the AEGON Plaintiffs and AmerUs.

383.   CFS's offers to sell were directed at the AEGON Plaintiffs and AmerUs in Iowa.
The AEGON Plaintiffs and AmerUs received solicitations to purchase the Securities in Iowa.

384.    By the acts previously alleged, CFS and its agents violated Section 502.401 of the
Iowa Uniform Securities Act.

385.    Mayer Brown is liable to the AEGON Plaintiffs and AmerUs under Section
502.503 of the Iowa Uniform Securities Act because Mayer Brown materially aided and abetted
the fraud perpetrated by CFS and its agents by, among other things, providing opinion letters to
Plaintiffs and the rating agencies and preparing PPMs, due diligence materials and other
transaction documents in connection with the SMART and GREAT securitizations.

386.    These materials were false and misleading in that, among other things, they failed
to disclose the following:

(a) That as early as September 1996, CFS's collections on SMART 96-2 failed to meet
its Base Case requirements and CFS included proceeds from Puts in its "collections"
numbers to mislead investors into believing that it was meeting Base Case cash flow
requirements for SMART 96-2;

(b) That CFS included the proceeds of the Loan Sales made to Cadle and Dimat in its
"collections" numbers for virtually all of its securitizations;

(c) That on several occasions, CFS depended on Loan Sales to make monthly principal
and interest payments to investors;

(d) That actual monthly collections for the SMART securitizations were substantially less
than the Base Case and Stress Case cash flow requirements for a number of the
securitizations;

(e) That CFS's ECR model failed to value the amount of cash that CFS could collect on
the Loans and did not comport with CFS's actual historical collections experience;

(f) That CFS regularly closed its Loan Sales on the last day of the month in the amount it
needed to make its Base Case and Stress Case requirements for the month and on a
cumulative basis;

(g) That CFS sold Loans to an entity affiliated with one of its shareholders and directors
who in turn funded the purchases with the proceeds of CFS's securitizations;

(h) That CFS was not the "strong" servicer depicted in Standard & Poor's January 1997
and Duff & Phelps' February 1997 Servicer Evaluations, which continued to be cited
in the PPMs and due diligence materials used to sell the Notes and that the facts
contained in those reports and upon which they were based were inaccurate;

(i)  That Vernick had resigned because, among other things, he discovered that the CFS securitization model was not viable and believed that no improvement in management or productivity would make it viable; and

(j)  That CFS's business model had become dependent on Loan Sales.

387.    The AEGON Plaintiffs and AmerUs justifiably relied upon Mayer Brown's misrepresentations and/or omissions of material fact to their detriment.  Had the AEGON Plaintiffs and AmerUs known the true facts, they would have:  (1) not purchased the Securities; (2) not continued to hold the Securities they had previously purchased; and (3) taken steps to protect the collateral underlying their SMART and GREAT Securities, including without limitation replacing CFS with a back-up servicer or putting the Loans back to CFS in accordance with the terms of the transaction documents.

388.    As a direct result of Mayer Brown's misrepresentations and omissions, the AEGON Plaintiffs and AmerUs suffered damage in an amount to be established at trial.

## COUNT VIII

**Violations of Massachusetts' Regulation of Business Practices for Consumer Protection (on behalf of The Liberty Companies)**

389.    Plaintiffs reallege and reincorporate the allegations in paragraphs 1 through 320.

390.    As previously alleged, CFS through the Trusts and its agents, made offers to sell the Securities to The Liberty Companies.

391.    CFS's offers to sell were directed at The Liberty Companies in Massachusetts and The Liberty Companies received solicitations to purchase the Securities in Massachusetts.

392.    Mayer Brown violated Section 2 of Chapter 93A of the Massachusetts General Laws because Mayer Brown made untrue statements of material fact and omissions of material fact in connection with the provision of legal services to CFS and the Liberty Companies.  These

misrepresentations and omissions were contained in Mayer Brown's opinion letters and in PPMs, due diligence materials and other transaction documents it prepared.

393.    These materials were false and misleading in that, among other things, they failed to disclose the following:

(a) That as early as September 1996, CFS's collections on SMART 96-2 failed to meet its Base Case requirements and CFS included proceeds from Puts in its "collections" numbers to mislead investors into believing that it was meeting Base Case cash flow requirements for SMART 96-2;

(b) That CFS included the proceeds of the Loan Sales made to Cadle and Dimat in its "collections" numbers for virtually all of its securitizations;

(c) That on several occasions, CFS depended on Loan Sales to make monthly principal and interest payments to investors;

(d) That actual monthly collections for the SMART securitizations were substantially less than the Base Case and Stress Case cash flow requirements for a number of the securitizations;

(e) That CFS's ECR model failed to value the amount of cash that CFS could collect on the Loans and did not comport with CFS's actual historical collections experience;

(f) That CFS regularly closed its Loan Sales on the last day of the month in the amount it needed to make its Base Case and Stress Case requirements for the month and on a cumulative basis;

(g) That CFS sold Loans to an entity affiliated with one of its shareholders and directors who in turn funded the purchases with the proceeds of CFS's securitizations;

(h) That CFS was not the "strong" servicer depicted in Standard & Poor's January 1997 and Duff & Phelps' February 1997 Servicer Evaluations, which continued to be cited in the PPMs and due diligence materials used to sell the Notes and that the facts contained in those reports and upon which they were based were inaccurate;

(i) That Vernick had resigned because, among other things, he discovered that the CFS securitization model was not viable and believed that no improvement in management or productivity would make it viable; and

(j) That CFS's business model had become dependent on Loan Sales.

394.    Mayer Brown's misstatements and omissions described above constitute deceptive acts and practices in the conduct of trade and commerce.

395.    Mayer Brown intended that The Liberty Companies rely on Mayer Brown's false statements and omissions.

396.    The Liberty Companies justifiably relied upon Mayer Brown's misrepresentations and/or omissions of material fact to their detriment.  Had The Liberty Companies known the true facts, they would have:  (1) not purchased the Securities; (2) not continued to hold the Securities they had previously purchased; and (3) taken steps to protect the collateral underlying their SMART and GREAT Securities, including without limitation replacing CFS with a back-up servicer or putting the Loans back to CFS in accordance with the terms of the transaction documents.

397.    As a direct result of Mayer Brown's misrepresentations and omissions, The Liberty Companies suffered damages in an amount to be established at trial.

398.    Mayer Brown is liable for the damages suffered by The Liberty Companies in an amount to be determined at trial, pursuant to Section 11 of Chapter 93A of the Massachusetts General Laws, M.G.L.A. 93A § 11.

399.    Because Mayer Brown knowingly violated Section 2 of Chapter 93A of the Massachusetts General Laws, The Liberty Companies are entitled to an award of treble damages.

## COUNT IX

### Violation of Section 1-501 of the Pennsylvania Securities Act of 1972
### (on behalf of the Miller Anderson and Morgan Stanley Plaintiffs)

400.    Plaintiffs reallege and reincorporate the allegations in paragraphs 1 through 320.

401.    As previously alleged, CFS, through the trusts and its agents, made offers to sell the Securities to the Miller Anderson and Morgan Stanley Plaintiffs.

402.    CFS's offers to sell were directed at the Miller Anderson and Morgan Stanley Plaintiffs in Pennsylvania. The Miller Anderson and Morgan Stanley Plaintiffs received solicitations to purchase the Securities in Pennsylvania.

403.    By the acts previously alleged, CFS and its agents violated Section 1-501 of the Pennsylvania Securities Act.

404.    Mayer Brown is liable to the Miller Anderson and Morgan Stanley Plaintiffs under Section 1-501 of the Pennsylvania Securities Act because Mayer Brown aided and abetted the fraudulent sales perpetrated by CFS and its agents. Mayer Brown did so by providing opinion letters and preparing PPMs, due diligence materials and other transaction documents that contained material misrepresentations and omissions.

405.    These materials were false and misleading in that, among other things, they failed to disclose the following:

(a) That as early as September 1996, CFS's collections on SMART 96-2 failed to meet its Base Case requirements and CFS included proceeds from Puts in its "collections" numbers to mislead investors into believing that it was meeting Base Case cash flow requirements for SMART 96-2;

(b) That CFS included the proceeds of the Loan Sales made to Cadle and Dimat in its "collections" numbers for virtually all of its securitizations;

(c) That on several occasions, CFS depended on Loan Sales to make monthly principal and interest payments to investors;

(d) That actual monthly collections for the SMART securitizations were substantially less than the Base Case and Stress Case cash flow requirements for a number of the securitizations;

(e) That CFS's ECR model failed to value the amount of cash that CFS could collect on the Loans and did not comport with CFS's actual historical collections experience;

(f) That CFS regularly closed its Loan Sales on the last day of the month in the amount it needed to make its Base Case and Stress Case requirements for the month and on a cumulative basis;

(g) That CFS sold Loans to an entity affiliated with one of its shareholders and directors who in turn funded the purchases with the proceeds of CFS's securitizations;

(h) That CFS was not the "strong" servicer depicted in Standard & Poor's January 1997 and Duff & Phelps' February 1997 Servicer Evaluations, which continued to be cited in the PPMs and due diligence materials used to sell the Notes and that the facts contained in those reports and upon which they were based were inaccurate;

(i) That Vernick had resigned because, among other things, he discovered that the CFS securitization model was not viable and believed that no improvement in management or productivity would make it viable; and

(j) That CFS's business model had become dependent on Loan Sales.

406.    The Miller Anderson and Morgan Stanley Plaintiffs justifiably relied upon Mayer Brown's misrepresentations and/or omissions of material fact to their detriment.  Had the Miller Anderson and Morgan Stanley Plaintiffs known the true facts, they would have:  (1) not purchased the Securities; (2) not continued to hold the Securities they had previously purchased; and (3) taken steps to protect the collateral underlying their SMART and GREAT Securities, including without limitation replacing CFS with a back-up servicer or putting the Loans back to CFS in accordance with the terms of the transaction documents.

407.    As a direct result of Mayer Brown's misrepresentations and omissions, the Miller Anderson and Morgan Stanley Plaintiffs suffered damages in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)    enter judgment in favor of Plaintiffs and against Mayer Brown for all damages sustained by Plaintiffs;

(b)    order Mayer Brown to pay Plaintiffs prejudgment interest;

(c)    award Plaintiffs the costs and expenses of this action, including reasonable attorneys' fees and expenses, experts' fees and expenses and other costs and disbursements; and

(d)    grant such other and further relief as the Court finds is just under the circumstances.

Respectfully submitted,

Lowell E. Sachnoff
Jeffrey T. Gilbert
SACHNOFF & WEAVER, LTD.
30 South Wacker Drive
Suite 2900
Chicago, Illinois  60606
(312) 207-1000

- and -

David L. Bryant, OBA #1262
BRYANT LAW FIRM PLLC
950 Kennedy Building
321 South Boston Avenue
Tulsa, Oklahoma  74103-3313
Tel.:  918-587-4200
Fax:  918-587-4217